COLORADO ASSOCIATION OF PUBLIC EMPLOYEES; C.W. Peterson; Shelley Ostrem; Jerry D. Aragon; Dennis Deutsch; Joyce Schuler; Shirley D. Blackmon; Ruth C. Robben; Marianne I. Galensky; and Jennifer M. Frank, Plaintiffs–Appellants,

v.

The BOARD OF REGENTS OF the UNIVERSITY OF COLORADO, and each of its members in their official capacities, Kathleen Arnold; Richard Bernick; Robert Caldwell; Peter Dietze; Lynn Ellins; Harvey Phelps; Norwood Robb; Roy Shore; and David Winn, Defendants–Appellees.

No. 89SA476.

Supreme Court of Colorado, En Banc.

Dec. 24, 1990.

Rehearing Denied Jan. 28, 1991.

Larry F. Hobbs, Hornbein MacDonald Fattor Hobbs P.C., and Vonda G. Hall, Colorado Ass'n of Public Employees, Denver, for plaintiffs-appellants.

Teryl R. Gorrell, Charles F. Luce, Jr., Moye, Giles, O'Keefe, Vermeire & Gorrell, Denver, Sp. Asst. Attys. Gen., and Ben A. Rich, Allen W. Staver, University of Colorado Health Sciences Center, Denver, for defendants-appellees.

Justice MULLARKEY delivered the opinion of the Court.

This is an appeal [1] from the Denver District Court's judgment upholding the constitutionality of House Bill No. 1143, Ch. 193, secs. 1 to 14, 1989 Colo.Sess.Laws 995–1006, which provided for the reorganization of the University of Colorado University Hospital as a private, nonprofit corporation. This act is mostly codified in sections 23–21–401 to –410, 9 C.R.S. (1990 Supp.). The plaintiffs challenged the constitutionality of the statute on two grounds: first, that it violates Article XII, Section 13, of the Colorado Constitution, the State Civil Service Amendment, and second, that it violates Article XI, Section 3, of the Colorado Constitution, the constitutional prohibition against public indebtedness. The trial court rejected both arguments. We reverse.

I.

The plaintiffs, the Colorado Association of Public Employees and employees of University Hospital, filed a complaint challenging the constitutionality of the statute under the Colorado Constitution on alternative grounds. They claimed that if the statute created a private corporation, then the statute violated Article V, Section 34, which prohibits public appropriations to private corporations, and Article XI, Section 2, which prohibits transfer of state assets to private corporations. In the alternative, they claimed that if the statute created a public corporation, then the statute violated Article XII, Section 13, the State Civil Service Amendment, and Article XI, Section 3, which prohibits state indebtedness.[2] The

---

1. Because this case involves an appeal from the final judgment of a district court in which the constitutionality of a statute is in question, this court has jurisdiction. *See* § 13–4–102(1)(b), 6A C.R.S. (1987).

2. They also claimed that the statute violated Article I, Section 10 of and the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983, and Article II, Sections 11 and 25 of the Colorado Constitution which guaran-

plaintiffs requested injunctive and declaratory relief.

By stipulation, the parties submitted briefs solely on the facial constitutionality of the statute. The trial court ruled that the plaintiffs failed to prove that the statute was unconstitutional. Specifically, the trial court held: (1) that the reorganized hospital was a private, nonprofit corporation which did not violate Article XV, Section 2, prohibiting special legislation, (2) that the statute does not violate Article XII, Section 13, the Civil Service Amendment, because the employees of the reorganized hospital will not be employees of the state, (3) that, by similar reasoning, the statute does not violate Article XI, Section 3, because the debts of the reorganized hospital will not be debts of the state, (4) that the statute does not violate Article XI, Section 1, prohibiting extending debt to private corporations because the statute comes within the public purpose exception, and (5) that, by stipulating to resolve the facial constitutionality of the statute for an accelerated trial, the plaintiffs abandoned their claims under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. 1983, as well as under Article V, Section 34, and Article XI, Section 2, of the Colorado Constitution.

Prior to the enactment of sections 23–21–401 to –410, the organization of the University Hospital was addressed in sections 23–21–101 to –113, 9 C.R.S. (1988).[3] The hospital was utilized for the health science education programs provided by the University of Colorado. § 23–21–104. Under section 23–21–102(1), control of the hospital was vested in the Board of Regents (the Regents) of the University of Colorado, members of which were elected to office pursuant to section 1–4–204, 1B C.R.S. (1980). The Regents were empowered "to manage, control, and govern such hospitals" under regulations it prescribed, § 23–21–102(1), and to provide for the operation of the hospitals "by any entity, public or private,

profit or nonprofit" to administer the operation of the hospital adequately and efficiently, § 23–21–102(3)(a).

Although the former statute granted the Regents a great degree of flexibility regarding the type of entity they could establish to operate the hospital, the Regents' power to provide for any entity was limited in section 23–21–102(3)(c) which stated, "No such provision shall adversely affect the rights, benefits, and privileges of any existing state personnel system employees of the university of Colorado nor deprive them of their status under the state personnel system." Furthermore, the Regents were required to appoint all employees of the hospital, "pursuant to the provisions of section 13 of article XII of the state constitution" which is the Civil Service Amendment, § 23–21–102(1). Under section 23–21–106.5, the Regents controlled the fees charged for professional services and the way in which such fees, when collected, were spent in the operations of the hospital. This last provision was not substantially changed by the new statute. *See* § 23–21–410, 9 C.R.S. (1990 Supp.).

The statute before us, consisting primarily of sections 23–21–401 to –410, was enacted in 1989 to enable the reorganization of University Hospital. In the statute, the legislature explains its rationale for this measure:

(1) The general assembly hereby finds and declares that: ...

(c) The present hospital, known as the university of Colorado university hospital, is unable to become and remain economically viable because it is subject to various kinds of government policy and regulation.

(d) Unless the hospital can become and remain economically viable, it will become ever more dependent upon state subsidies, and the quality of medical service and education will inevitably decline.

tee due process of law. These claims are not before us.

**3.** The University Hospital of the University of Colorado was established by the Board of Regents pursuant to Article VIII, Section 5. This

provision authorizes the Board of Regents to "establish, maintain, and conduct all or any part of the schools of medicine" in Denver and allows it to discontinue the medical center.

(e) The needs of the citizens of the state of Colorado and the university of Colorado health sciences schools will best be served if the hospital is reorganized to operate as a private nonprofit corporation charged with the mission of operating a teaching hospital for the benefit of the health sciences schools and providing care for the medically indigent.

§ 23–21–401. Because the Regents were already authorized under the prior statute to establish the hospital as a private, nonprofit entity, the Regents' authority to "[t]ake all steps necessary to create a private nonprofit-nonstock corporation" granted in section 23–21–403(1)(a) grants no new authority to the Regents.

Several of the new provisions do result in changes in the organization of the hospital. Under the new provisions, the Regents transferred the hospital assets and liabilities to the corporation on October 1, 1989, except for the land which was leased to the corporation for a term not to exceed ninety-nine years. § 23–21–403(1)(b). The corporation is required by the statute to award hospital privileges exclusively to the "health care providers who are faculty members of the health sciences schools of the university of Colorado." § 23–21–404(1)(e). The statute specifically states, "The corporation shall not be an agency of state government, nor a department or political subdivision [4] thereof." § 23–21–403(1)(a). Accordingly, this new corporation "shall not be subject to any provisions of law affecting only governmental or public entities." *Id.* Should the corporation dissolve, the assets of the corporation less amounts owed to creditors will revert to the Regents. § 23–21–404(1)(g).

The corporation is governed by a Board of Directors (the Directors) composed of nine members who are appointed by the Regents and confirmed by the Senate. § 23–21–404(1)(b). The Regents may remove the Directors at any time. *Id.* The Directors are responsible for operating the hospital day-to-day and have the explicit power to issue bonds or borrow money on behalf of the corporation. § 23–21–404(1)(d). However, they may not borrow more than ten million dollars at any time. *Id.*

The statute allows the Regents and the Directors to borrow money and to issue bonds. The Regents may do so on behalf of the corporation for any of its lawful purposes. § 23–21–403(1)(e). Any bonds issued by the Regents must comply with the requirements applicable to counties and municipalities. *Id.* The Directors are authorized to borrow up to ten million dollars on behalf of the corporation without the Regents' approval. § 23–21–404(1)(d). The aggregate indebtedness incurred by both the Regents and the Directors is thirty million dollars in the first fiscal year and sixty million dollars in the second fiscal year. § 23–21–404(1)(i).

The reorganization affected the status of approximately 2,000 classified employees of the University Hospital. According to the terms of subsections 23–21–406(1) and (2), any hospital employee who is classified as an employee under the state personnel system may elect to become an employee of the new corporation, thereby leaving the state personnel system, or may stay on with this new corporation as a state employee under contract for up to two years. Once the employee elects to join the new corporation, that employee is not eligible to return to the state personnel system and ceases to be an active member of the Public Employees Retirement Association (PERA). §§ 23–21–406(2), –407(1).

Section 23–21–407 governs how the rights of the former state employees to retirement benefits are affected by the reorganization. Although the provisions differ depending on years of service credit at the time of the transfer, the general concept is that members "shall receive, upon retirement, a benefit at least equal to the benefit they would have received from

---

**4.** Here the entity established is distinctly different from those entities established as political subdivisions, specifically, the Colorado Housing and Finance Authority and the Colorado Compensation Insurance Authority. *See* § 29–4–704, 12A C.R.S. (1990 Supp.) and § 8–45–101, 3B C.R.S. (1990 Supp.).

PERA if they continued to earn PERA service credit until retirement or such earlier date upon which they cease to be an employee of the corporation based on the PERA benefit plan in effect on the transfer date." §§ 23–21–407(2)–(3).

Even though the reorganized hospital is not governed by provisions of law affecting only government or public entities, § 23–21–403(1)(a), the General Assembly has a continuing role in the reorganized hospital's activities under the articles of incorporation. Any change in the mission of the reorganized hospital or in certain articles of incorporation must be approved by the General Assembly. §§ 23–21–401(1)(g), –404(1)(*l*). Should the reorganized hospital wish to transfer the corporation to "any person or entity except the regents" or to exceed the sixty million dollar indebtedness limit after two years, it can only do so with the approval of the General Assembly. §§ 23–21–404(1)(f), (i). The General Assembly is further involved in the operation of the corporation to the extent that the Legislative Audit Committee and four other members appointed by the Governor compose the Board of Visitors, which reviews every two years the corporation's use of state funds for the medically indigent. § 23–21–405. It then reports its findings to the General Assembly, the Governor, the Regents, and the Directors. *Id.*

## II.

■ The standard of review under which a statute is tested against the Colorado Constitution was expressed by this court in *Colorado Association of Public Employees v. Lamm,* 677 P.2d 1350, 1353 (Colo. 1984):

> The General Assembly has plenary legislative powers, conferred by the people in their Constitution. *People ex rel. Tucker v. Rucker,* 5 Colo. 455 (1880). These powers, however, are subject to express or implied restraints reflected in the Con-

stitution itself. *People ex rel. Livesay v. Wright,* 6 Colo. 92 (1881); *People ex rel. Tucker v. Rucker, supra.* The legislature cannot enact a law contrary to those constitutional restraints. *Mauff v. People,* 52 Colo. 562, 123 P. 101 (1912). We have consistently recognized that every statute is presumed to be constitutional and this presumption can be overcome only by showing that the enactment is unconstitutional beyond a reasonable doubt. *E.g., Colorado Auto & Truck Wreckers Association v. Department of Revenue,* 618 P.2d 646 (Colo.1980); *Mr. Lucky's, Inc. v. Dolan,* 197 Colo. 195, 591 P.2d 1021 (1979).... Where the language of the Constitution is plain and its meaning clear, that language must be declared and enforced as written. *Id.; People ex rel. Park Reservoir Co. v. Hinderlider,* 98 Colo. 505, 57 P.2d 894 (1936).

Thus, the plaintiffs have the burden to establish that sections 23–21–401 to –410 are unconstitutional beyond a reasonable doubt. With this principle in mind, we now address the issues raised by the plaintiffs.

■ The trial court's determination that sections 23–21–401 to –410 are constitutional rested upon its finding that the reorganized hospital is a private corporation formed under Article XV, Section 2, of the Colorado Constitution. As such, it would not be a public entity to which Article XII or Article XI would apply. We find, however, that University Hospital remains, in substance, a state entity. Accordingly, we find that the legislative plan embodied in sections 23–21–401 to –410, violates Article XII, Section 13.

■ Private nonprofit corporations are corporations formed by private individuals for a public purpose [5] in which, "no part of the income or profit of which is distributable to its members, directors or officers, ...." Section 7–20–102(10), 3A C.R.S. (1986).[6] Ultimate control of the corpora-

---

5. Section 7–20–104, 3A C.R.S. (1986), provides a nonexhaustive list of public purposes with some exceptions which are not relevant here.

6. This section was in effect at the time the corporation was formed. It has since been amended. *See* § 7–20–102(10), 3A C.R.S. (1990 Supp.).

tion is vested in the members or the directors through their power to vote. *See* § 7–23–106(3), 3A C.R.S. (1990 Supp.). In contrast, public corporations are created as subdivisions of the state as an expedient device to carry out the functions of government. In *People ex rel. Rogers v. Letford*, 102 Colo. 284, 295, 79 P.2d 274, 281 (1938), we stated: "Public corporations are all those created specially for public purposes as instruments or agencies to increase the efficiency of government, supply public wants, and promote the public welfare."

■ This court has not addressed the public/private dichotomy specifically in the hospital context, but several other jurisdictions have done so. In *Woodard v. Porter Hosp., Inc.*, 125 Vt. 419, 422, 217 A.2d 37, 39 (1966), the Vermont Supreme Court made the following distinction in the hospital context:

> [A] public hospital is an instrumentality of the state, founded and owned in the public interest, supported by public funds, governed by those deriving their authority from the state. A private hospital is founded and maintained by private persons or a corporation, a state or municipality having no voice in the management or control of its property or the formation of rules for its government.

*See also Green v. Board of Directors of Lutheran Medical Center*, 739 P.2d 872, 874 (Colo.Ct.App.1987); *Even v. Longmont United Hosp. Ass'n*, 629 P.2d 1100, 1102 (Colo.Ct.App.1981); *Edson v. Griffin Hosp.*, 21 Conn.Supp. 55, 57–58, 144 A.2d 341, 343 (1958); *Levin v. Sinai Hosp. of Baltimore City*, 186 Md. 174, 178, 46 A.2d 298, 300 (1946); *State v. Ohio Valley General Hosp. Ass'n*, 149 W.Va. 229, 233, 140 S.E.2d 457, 460 (1965). In *Shulman v. Washington Hosp. Center*, 222 F.Supp. 59, 61 (D.C.Cir.1963), the court explained:

> The fact that a hospital is operated for the benefit of the public and not for profit, does not detract from its character as a private institution, if it is established and maintained by a private corporation or individual with authority to

elect or appoint its own officers and directors.

Thus, whether University Hospital may be considered private depends upon whether 1) it is founded and maintained by private individuals or a private corporation and 2) the state is involved in the management or control of its property or internal operations.

Under the facts before us, the reorganized hospital clearly cannot be characterized as a private hospital. With respect to the first factor, the Regents, who are elected officials, established the hospital pursuant to authority granted in Article VIII, section 5 of the Colorado Constitution and section 23–21–403(1)(a). Thus, the hospital was founded by state officials, not private individuals.

Our analysis of the second issue focuses on the Regents' continuing role in controlling the operation of the reorganized hospital. Under section 23–21–404(1)(b), the Regents appoint the Board of Directors and may remove the members of the board at any time. Although the Directors govern the corporation that operates the hospital from day to day, the power of the corporation "to arrange for the billing, collection, and disbursement for professional services" rests with the Regents. § 23–21–410(1). The fees collected for the professional services (in essence, the gross income of the hospital) are to be used for "the remuneration and support of the professional, research, and educational activities of the members of the faculty of the schools of medicine and dentistry and shall also be used for the administrative costs of such activities, *in accordance with rules to be adopted by the regents.*" § 23–21–410(2) (emphasis added). This section indicates that the Regents control the budget and spending of the hospital.

Both the Regents and the Directors are authorized to borrow up to thirty million dollars in the first year and sixty million dollars in the second year. § 23–21–404(1)(i). In the years following, the General Assembly may raise the limit if it chooses. *Id.* All funds borrowed except the ten million dollars within the Directors'

discretion must meet the Regents' approval. Even the ten million dollars, when borrowed, implicitly must meet the Regents' approval since the Regents bear a relation to the Directors which is, in effect, that of an employer to an employee. Thus, the Regents explicitly control sixty-seven percent to eighty-three percent of the potential indebtedness of the corporation and control how the income of the hospital will be spent. Implicitly, they control the remaining seventeen percent to thirty-three percent of the potential indebtedness of the corporation as well as the day-to-day operations of the hospital by virtue of the power to remove the Directors.

In view of the Regents' creation of the corporate hospital and their continuing control over the internal operations of the reorganized hospital, it is evident that the Regents have not sufficiently divested themselves of power over the hospital to enable the new corporation to operate independently as a private corporation. Thus, we find that the reorganized hospital is still a public entity.[7] We next consider whether the University Hospital as a public entity is subject to the constitutional limitations contained in Article XII, Section 13 and Article XI, Section 3.[8]

**7.** This finding is in partial accordance with the court's conclusions in *Queen v. West Virginia Univ. Hosp.,* 365 S.E.2d 375 (W.Va.1988), a case upon which the Regents strongly rely, although that court never definitively classified the status of the reorganized hospital.

*Queen* involved the hospital reorganization statute after which the Colorado statute was modeled. Even though the West Virginia statute did not designate the nonprofit-nonstock corporation as "private," the court indicated that it was possible that this corporation was formed under general corporation laws of the state which are normally considered to create private corporations. *Id.* at 380. In its analysis of whether the hospital statute violated a provision in the state constitution forbidding the state from extending credit to or becoming liable for the debts of any corporation, the court chose a different tack. It reasoned that since the corporation was nonprofit, it fell outside of the coverage of the constitution. The court found that the constitutional framers were "exclusively concerned" with private corporations which were profit-making enterprises. *Id.*

The court indicated, however, that the hospital was public in its analysis of whether the

## III.

Article XII, Section 13 establishes the personnel system of the state. Appointments and promotions are "made according to merit and fitness, to be ascertained by competitive tests of competence without regard to race, creed, or color, or political affiliation." Art. XII, § 13(1). The personnel system consists of all appointive political officers and employees of the state with certain specified exceptions. Art. XII, § 13(2). One such exception from the personnel system is for employees who are employed by political subdivisions of the state. However, a political subdivision may contract with the state for employees if authorized to do so by law. *Id.*

The hospital reorganization statute deals with the state personnel system in section 23–21–406, which states:

(1) Any hospital employee who is a classified employee of the state personnel system on the transfer date shall have the option to become an employee of the corporation or to remain an employee of the state and a member of the state personnel system.

(2) Any hospital employee who elects to remain a member of the state personnel

hospital statute violated the constitutional prohibition against special laws relating to private corporations. The court found that the hospital was not private because it was required to fulfill government functions and its primary object was not the "personal emolument of its stockholders." *Id.* at 381.

**8.** Because we hold that the corporation established under sections 23–21–401 to –410, is not a private corporation, we need not address whether the statute violates Article V, Section 34, which prohibits the state from making appropriations to private corporations or whether the statute is a special law in violation of Article XV, Section 2. Similarly, we need not address the trial court's holding that the Regents' power to borrow money and to issue bonds on behalf of the corporation as provided in section 23–21–403(1)(e) does not violate Article XI, Section 1 and Section 2 of the Constitution, because these provisions generally apply when the propriety of government aid to private corporations is at issue. *See Witcher v. Canon City,* 716 P.2d 445, 455 (Colo.1986); *Gude v. City of Lakewood,* 636 P.2d 691, 695 (Colo.1981); *McNichols v. City and County of Denver,* 131 Colo. 246, 251–252, 280 P.2d 1096, 1099–1100 (1955).

system may remain so for a period of not more than two years, but shall not be eligible to return to the state personnel system as a hospital employee once he has elected to become a corporation employee.

The plaintiffs claim that the reorganization of University Hospital amounts to a legislative effort to free the Regents from complying with the requirements of the state personnel system which expressly applied under the former hospital organization statute. Because we find that the hospital is still a public entity, we must examine whether, as such, it is subject to the requirements of the state personnel system set forth in Article XII, Section 13.

This amendment was adopted in 1918 and contained provisions detailing the structure of the civil service. In 1919, this court interpreted the amendment for the first time in *People ex rel. Clay v. Bradley*, 66 Colo. 186, 179 P. 871 (1919), and took judicial notice of the history of former legislation involving the civil service. We stated:

> In addition we may take judicial notice of the history of the legislation concerning the civil service. Before the act of 1912, Legislatures were occasionally hostile to the merit system, and refused appropriation[s] to support the commission. The act of 1912 was initiated to compel appropriations and to remedy other defects, and did so. By the act of 1915, however, which repealed all former laws, the Legislature, from the standpoint of those especially devoted to the merit system, destroyed much of its beneficial effect, and a constitutional amendment was initiated accordingly for the very purpose of avoiding the destruction or emasculation

of the law in the future by some possible hostile General Assembly.

*Id.* at 872. In the years since 1919,[9] this court has recognized that this amendment embodies the strong disposition of the people of Colorado to protect the state civil service system from "destruction or emasculation of the law in the future by some possible hostile general assembly." *Id.* *See Colorado State Civil Serv. Employees Ass'n v. Love*, 167 Colo. 436, 446, 448 P.2d 624, 628 (1968).

It is undisputed that the transfer of University Hospital to a nonprofit-nonstock private corporation was intended to remove the hospital from the scope of the state personnel system. However, the Regents argue that the result of the legislation, the elimination of approximately 2,000 civil service jobs, was not "hostile" and that this statute evidences "the highest regard and the greatest care in protecting the rights of certified employees to remain as part of the state personnel system."[10] This court need not find actual "hostility" on the part of the legislature. The simple fact that the legislative measure terminates a large number of jobs within two years is enough to invoke the concerns expressed by this court in *Bradley*.

As discussed above, not all public entities are subject to the personnel amendment. In order to consider whether the reorganized hospital is a public entity that is outside the coverage of the state personnel system, we must examine the reorganized hospital closely. On the day following the transfer, the new hospital was, under its articles of incorporation, operated by a Board of Directors consisting of nine mem-

---

9. Article XII, Section 13 of the constitution was repealed and reenacted with amendments in 1970. These amendments resulted in the establishment of a separate department of personnel headed by a state personnel director, responsible for administering this system. Also, the three-member Civil Service Commission was replaced by a five-member state personnel board that primarily has a policy-making role. In addition, there were other changes designed to modernize and improve the state personnel system.

10. The statute now before us does not "grandfather" incumbent employees who hold classified positions. *Compare* § 8–45–101(9), 3B C.R.S. (1990 Supp.) (when the legislature created the Colorado Compensation Insurance Authority, employees already employed with the division of state compensation insurance were permitted to choose to remain in the personnel system indefinitely) *and* W.Va.Code § 18–11C–4(d) (1988) (the West Virginia hospital reorganization statute, after which the Colorado statute was modeled, allows the pre-reorganization employees to choose to remain with the state personnel system).

bers appointed by the Regents, confirmed by the Senate, and serving at the discretion of the Regents. The Regents and the Directors were empowered to issue bonds and borrow money. The new hospital was empowered to participate in joint ventures with other private corporations, to participate in hospital purchasing pools, and to hire employees outside the personnel system.

The operations of the hospital, nonetheless, remained the same. On the day following the transfer, the hospital still was operated by appointees who served at the discretion of the Regents. The employees of the new nonprofit-nonstock corporation returned to the same jobs at the same hospital at which they had worked the previous day. The hospital still limited staff privileges exclusively to the faculty of the medical school and provided a clinical environment exclusively for the Colorado School of Medicine. The Regents continued to control the new hospital just as they did the old. Thus, we find that the changes in University Hospital were changes of form, not substance, that did not affect the nature of the jobs held by the civil service employees.

Our conclusion is consistent with prior decisions of this court relating to the coverage of the personnel system. This case resembles closely the situation in *People ex rel. Kelly v. Milliken*, 74 Colo. 456, 223 P. 40 (1924), in which the jobs of license inspectors were abolished and then re-created two years later with substantially identical duties, but with a different job title. This court held that the inspectors were entitled to be rehired when the jobs were re-created. In explanation, we stated:

> Since their tenure of office is secured to them by the Constitution, the so-called civil service amendment (article 12, § 13), the legislature has no power to deprive them of it. That body has, indeed, the power to abolish the office, but it may not avoid the Constitution by abolishing the office and creating a new one with duties substantially the same, to which new officers are appointed.

*Milliken*, 74 Colo. at 457, 223 P. at 40. *Cf. Colorado Ass'n of Public Employees v. Lamm*, 677 P.2d 1350, 1360 (Colo.1984) (statute required the construction of "upward allocation of position" and the "movement of the incumbent employee with his position" as something other than a promotion to fall outside the coverage of Article XII, Section 13; court rejected proposed distinction as "euphemistic").

The case before us involves on a larger scale the situation where the old offices are abolished and new ones are created. Here, the old employees may keep their jobs but only if they give up the protection of the rights and guarantees secured in the State Personnel System. We have held that a mere change in the nomenclature of an employee's job title from "officer" to "commissioner" does not change the essence of the employee's position for purposes of the employee's status in the civil service. *Campbell v. State*, 176 Colo. 202, 207, 491 P.2d 1385, 1388 (1971). By analogy, a mere change in the nomenclature of the hospital does not change the essence of the employee's position for purposes of civil service. Thus, we do not find the nature of the new hospital changed such that it falls outside the scope of the constitutional amendment. Accordingly, we hold that section 23–21–406 is unconstitutional because it violates Article XII, Section 13, which protects state personnel from legislative measures designed to circumvent the constitutional amendment.

## IV.

Given our conclusion that the reorganized hospital remains a public entity, we need not analyze the operation of the statutory provisions which allow the Regents and the Directors to incur debt on behalf of the reorganized hospital. Indeed, the Regents have not attempted to defend the debt-financing scheme as applied to a public entity, even though the plaintiffs attacked the statute on the basis that such debt would be unconstitutional.

The ability of a public entity to engage in debt financing is constrained by Article XI,

Section 3 [11] of the Colorado Constitution. Under our caselaw, however, Article XI, Section 3 is not a complete bar. The financing devices that we have upheld under this constitutional provision fall generally into three categories: (1) special fund cases in which the funds borrowed are repaid out of the revenue generated by the improvement, *Perl–Mack Civic Ass'n v. Board of Directors of Baker Metro. and Sanitation Dist.,* 140 Colo. 371, 374, 344 P.2d 685, 687 (1959); (2) cases in which the borrowing entity is a public entity independent from the state, *In re Interrogatories by the Colorado State Senate,* 193 Colo. 298, 305, 566 P.2d 350, 355 (1977); and (3) cases in which the government enters into a lease/purchase agreement for a building or other improvement with an independent body and in which the parties are not bound to renew the lease at the end of each year, *Glennon Heights, Inc. v. Central Bank & Trust,* 658 P.2d 872, 878–879 (Colo. 1983).

Here it is apparent from a review of the statute and its legislative history that the legislature's authorization for debt financing was based on its assumption that the reorganized hospital would be a private, nonprofit corporation. Throughout the legislative discussions, the reorganized hospital was referred to as "private" or "quasi-private." Senator Wells, the prime Senate sponsor of the bill, explained that the bill would "privatize" the hospital and would allow it to issue bonds "as a quasi private institution will be able to do." His testimony indicates his belief that the hospital as a part of the state could not issue bonds. Vol. 6 at p. 446, Transcript of Legislative History of House Bill 1143. Our review of the legislative history discloses great legislative concern with the propriety of transferring state assets to the reorganized hospital as a private entity. *See, e.g.,* vol. 2 at p. 132, Transcript of Legislative History of House Bill 1143 (remarks of Rep. Paulson). *See also* Colo. Const. Art. XI, §§ 1, 2.

However, we find no evidence of legislative intent to enable the reorganized hospital to borrow money if it remains a public entity. Accordingly, the legislature did not attempt to structure the debt financing provided in the act so that it would comply with Article XI, Section 3 and the relevant caselaw regarding public entities. We note, for example, that the act contains no provision for repayment of funds borrowed by the Directors.

In our view, the debt financing provisions of the statute are inextricably intertwined with the legislative purpose to create the reorganized hospital as a private, nonprofit corporation. Since that effort has failed and we have found that the reorganized hospital is a public entity, the debt financing provisions of the statute which are dependent on the existence of the reorganized hospital as a private, nonprofit entity also must fail. *See* § 2–4–204, 1B C.R.S. (1980); *Gallegos v. Phipps,* 779 P.2d 856, 863 (Colo.1989).

We recognize that the statute contains a severability clause. § 23–21–409, 9 C.R.S. (1990 Supp.). However, we find that the debt financing provisions are not severable from the portions of the statute which we have found unconstitutional in part III of this opinion. *City of Lakewood v. Colfax Unlimited Ass'n, Inc.,* 634 P.2d 52, 70 (Colo.1981); 2 N. Singer, *Statutes and Statutory Construction* § 44.04, .08 (C. Sands 4th rev. ed. 1986). Hence, we invalidate the act in its entirety.

*Conclusion*

The plaintiffs challenged the constitutionality of House Bill 1143, Ch. 193, secs. 1 to 14, 1989 Colo.Sess.Laws 995–1006, on the grounds that it violates Article XII, Section 13 and Article XI, Section 3 of the Colorado Constitution. Because we find that the statute violates Article XII, Section 13, and is unconstitutional beyond a reasonable doubt, we reverse.

---

**11.** Article XI, Section 3 provides in relevant part:

Section 3. Public debt of the state—limitations. The state shall not contract any debt by loan in any form, except to provide for casual deficiencies of revenue, erect public buildings for the use of the state, suppress insurrection, defend the state, or, in time of war, assist in defending the United States....

KIRSHBAUM, J., specially concurs.

ROVIRA, C.J., and ERICKSON, J., dissent.

Justice KIRSHBAUM specially concurring.

Although I agree with the conclusion reached in part II of the majority opinion that the hospital created by sections 23–21–401 to –410, 9 C.R.S. (1990 Supp.) (the Act), is a public rather than a private institution, I do so on grounds more narrow than those articulated by the majority. I join part III of the majority opinion, concluding, for the reasons set forth therein, that section 23–21–406, 9 C.R.S. (1990 Supp.), violates provisions of article XII, section 13, of the Colorado Constitution establishing the personnel system for this state's public entities.

In adopting the Act, the General Assembly clearly intended to create a private, not a public, corporation. §§ 23–21–401(1)(e), –402(3), –403(1)(a), 9 C.R.S. (1990 Supp.). In the context of the facial constitutional challenge asserted by the plaintiffs in this action, the initial question is whether the Act as adopted achieves that goal. The factors relevant for a determination of whether an entity such as the hospital is in fact a private or a public entity include the source and purposes for the establishment of the institution and the source of ultimate authority and control over the institution's policies, fiscal operations and provision of services. *See Queen v. West Virginia Univ. Hosp.*, 365 S.E.2d 375 (W.Va.1987); *Woodard v. Porter Hosp., Inc.*, 125 Vt. 419, 217 A.2d 37 (1966).

The majority does not suggest that an institution not "founded and maintained by private individuals or a private corporation" can never be deemed a "private" entity. (at 143). If that were the case, such governmentally created institutions as the Future Farmers of America, 36 U.S.C. § 271 (1988), and the Boy Scouts of America, 36 U.S.C. § 21 (1988), might be deemed public rather than private nonprofit corporations. The Legal Services Corporation, 42 U.S.C. § 2996 (1988), subject to great direct Congressional control, has been found to be a private, not a public, corporation. *Spokane County Legal Serv. v. Legal Serv. Corp.*, 433 F.Supp. 278 (E.D. Wash.1977).

The inquiry must, as the majority indicates, focus on the degree to which governmental sources in fact exercise actual control over essential functions of a particular entity. In this case, I do not find the presumed authority of the regents to remove members of the hospital's board of directors to be a critical factor. In considering a facial challenge to a statute, our responsibility is to ascertain whether a constitutionally valid construction is reasonable and practical in view of the purpose and context of the statute. *See Mr. Lucky's v. Dolan*, 197 Colo. 195, 591 P.2d 1021 (1979). Section 23–21–404(1)(b) states in pertinent part as follows:

Nothing in this paragraph (b) shall be construed to limit the power of the regents to remove any director at any time.

§ 23–21–404(1)(b), 9 C.R.S. (1990 Supp.). On its face, this sentence neither grants unlimited authority to the regents to remove directors of the hospital nor indicates the extent of such authority. However, in section 23–21–403(1)(a), 9 C.R.S. (1990 Supp.), the General Assembly has provided that, unless otherwise established by the Act, the corporation "shall have all the rights and powers of a private nonprofit corporation organized under the laws of this state." Construing these provisions together, in light of the admitted legislative intent to create a private corporation, I conclude that the board of directors of the hospital shall have the same authority to remove its members as do all other boards of directors of hospitals under their respective articles of incorporation and bylaws. *See* § 10–16–106(1), 4A C.R.S. (1987). Since the Act itself does not authorize the regents to adopt any rule or regulation defining the circumstances in which this removal authority may be exercised, the regents' authority to remove directors may, in my view, be defined by valid rules or regulations adopted by the hospital's board of directors. Such construction would support the legislative intent and give harmonious content to an otherwise problematical sentence.

As indicated, I do not agree that, properly construed, the final sentence of section

23–21–404(1)(b) confers any impermissible control by the regents over the hospital's policies or operations. Nor do I agree that the provisions of section 23–21–405, 9 C.R.S. (1990 Supp.), authorizing review of the hospital's use of state funds by a separate board of visitors, establishes any measurable degree of control by the regents or state institutions over the hospital's operations. Such review and reporting functions are consistent with legislative concerns over proper accounting for expenditures of state funds and, in my view, do not amount to impermissible government authority over daily operations.

However, I agree with the majority that the provisions of section 23–21–401(1)(g), 9 C.R.S. (1990 Supp.) (the General Assembly must approve any change in the hospital's mission), section 23–21–404(1)(f), 9 C.R.S. (1990 Supp.) (the General Assembly must approve the transfer of the corporation to any entity other than the regents), section 23–21–404(1)(i) (the General Assembly may limit the aggregate indebtedness of the hospital), and section 23–21–404(1)(*l*) (the General Assembly may limit the ability of the hospital to amend its articles of incorporation), establish substantial governmental authority over essential features of the hospital's activities. More significantly, the provisions of section 23–21–410(1), 9 C.R.S. (1990 Supp.), and section 23–21–410(2), 9 C.R.S. (1990 Supp.), require the regents, not the hospital's board of directors, to determine by rules or regulations the basis for charges for all services rendered by the hospital and the allocation of all income received by the hospital from the provision of such services. The lodging of this ultimate control over the hospital's fundamental policies and functions outside the authority of the hospital's board of directors and wholly within the authority of the public regents establishes beyond a reasonable doubt that the direction and operations of the hospital will be determined by public, not private, personnel. No rules of statutory construction can alter the plain meaning of these statutory provisions. The effect, unfortunately, is to irreparably undermine the stated legislative intent. I therefore concur with the majority's con-

clusion in part II of its opinion that the entity created by the Act is essentially public in nature.

Chief Justice ROVIRA dissenting:

In October 1989, the Board of Regents of the University of Colorado ("the Regents") created a private nonprofit, nonstock corporation ("the Hospital Corporation") to operate the University Hospital of the University of Colorado, pursuant to the Act to Reorganize University Hospital as a Private Nonprofit Corporation ("the Act"), 1989 Colo.Sess.Laws 995–1008, (codified at §§ 23–21–401 to –22–111, 9 C.R.S. (Supp. 1990)). Notwithstanding the legislative pronouncements declaring that any corporation created under the Act would be private and notwithstanding the statutory provisions limiting the state's role in the operation of any corporation formed under the Act, the majority holds that the Hospital Corporation is a public corporation subject to article XII, section 13, the state-personnel system provision, of the Colorado Constitution. The majority then proceeds to find that the Act violates the Colorado Constitution. I do not agree that the Hospital Corporation is a public corporation, or that the Act violates the state constitution. Accordingly, I respectfully dissent.

" 'Public corporations are all those created specially for public purposes as instruments or agencies to increase the efficiency of government, supply public wants, and promote the public welfare. Public corporations are classified as municipal, quasi-municipal, and public-quasi corporations.' " *People ex rel. Rogers v. Letford,* 102 Colo. 284, 297, 79 P.2d 274, 281 (1938) (quoting 43 C.J. *Municipal Corporations* § 11, at 72–73 (1927)); *accord Bailey v. People,* 200 Colo. 549, 552–53, 617 P.2d 549, 551 (1980). The term "public corporation" has been used consistently in various contexts to refer to entities created as subdivisions of the state to carry out governmental functions. For example, in the context of foreign-trade zones, the legislature has defined "public corporation" as:

[T]he state of Colorado, any political subdivision, municipality, or city and county thereof, any public agency of the state of Colorado, any political subdivision, mu-

nicipality, or city and county thereof, or any corporate municipal instrumentality of the state of Colorado or of the state of Colorado and one or more other states. § 7–49.5–103(6), 3A C.R.S. (1986); *see* § 29–1–202(2), 12A C.R.S. (1986) ("political subdivision" includes "public corporation organized pursuant to law" in intergovernmental-relationships statute); *see also Paulu v. Lower Arkansas Valley Council of Gov'ts*, 655 P.2d 1391, 1392 (Colo.App.), *cert. denied* (1982) (equating "public corporation" with municipal or quasi-municipal corporation in context of wage statute).

As the legislature and this court have defined "public corporation,"[1] I do not believe that the Hospital Corporation, as created by the Regents pursuant to the Act, constitutes a public corporation. The Act narrows the role of the Hospital Corporation beyond what can be considered a municipal or quasi-municipal entity. Under the Act, the Hospital Corporation must "assume responsibility for and shall defend, indemnify, and hold harmless" the state and Regents with respect to:

(a) All liabilities and duties of the regents pursuant to contracts, agreements, and leases for commodities, services, and supplies utilized by the hospital, including real property leases;

(b) All claims related to the employment relationship after the transfer date between employees of the corporation and the corporation;

(c) All claims for breach of contract resulting from the corporation's action or failure to act after the transfer date;

(d) All claims related to the corporation's professional errors and omissions, including medical malpractice; directors and officers liability; workers' compensation; automobile liability; premises, completed operations, and products liability; and any other liabilities of the corporation.

§ 23–21–403(2); *cf.* § 24–10–103(5) and –106, 10A C.R.S. (1988) ("public entity," which includes special improvement district "and every other kind of district, agency,

instrumentality, or political subdivision of the state organized pursuant to law," shall be immune from liability for injury). Moreover, under the Act the Regents may only create a *"private* nonprofit-nonstock corporation" under the Colorado Nonprofit Corporation Act, and the Hospital Corporation "shall not be an agency of state government, nor a department or political subdivision thereof[; nor shall it] be subject to any provisions of law affecting only governmental or public entities." § 23–21–403(1)(a); *see* § 23–21–401(1)(e) (legislative declaration that University Hospital will operate as "a private nonprofit corporation"); *cf., e.g.,* Colo. Const. art. XIV, § 17(1)(a) and (4)(a) ("general assembly shall provide by statute for the organization, structure, functions, services, facilities, and powers of service authorities" and such service authorities "shall be a body corporate and a political subdivision of the state").

Notwithstanding the foregoing statutory provisions, the majority reasons that the Hospital Corporation is a public entity because it was founded by the Regents, who are "state officials, not private individuals," and because of the "Regents' continuing role" in controlling the operation of the Hospital Corporation. Maj. op. at 143–144. I am not persuaded by this analysis. Under the majority's reasoning, neither the legislature nor the Regents can create a private, nonprofit corporation if the corporation is established by state officials pursuant to legislative authority, and so long as they retain any control over the corporation. Yet, the law governing nonprofit corporations, §§ 7–20–101 to –29–107, 3A C.R.S. (1986 & Supp.1990), specifically contemplates that a nonprofit corporation may be created by the legislature, and the legislature in enacting the Act intended that the Hospital Corporation be created under the nonprofit-corporations statute. *See* § 23–21–403. Section 7–20–102(2)(a) of the nonprofit corporations statute provides that "articles of incorporation" include:

For a corporation created by special act of the general assembly or pursuant

---

1. Because the statutes and this court have adequately defined "public corporation," I find it unnecessary in answering the question of

whether the Hospital Corporation is a public corporation to consider how other jurisdictions have defined "public corporation."

to general law, which corporation has elected to accept the provisions of said articles 20 to 29, the special charter and any amendments thereto made by special act of the general assembly or pursuant to general law prior to the corporation's election to accept the provisions of said articles.

The Regents' limited control over the Hospital Corporation, as permitted through the Act, is consistent with the nonprofit-corporations statute. Section 7–21–102 provides that the articles of incorporation shall include the purpose for which the corporation is organized and "[a]ny provisions, not inconsistent with law, which the incorporators elect to set forth in the articles of incorporation for the regulation of the internal affairs of the [nonprofit] corporation...." Likewise, section 7–23–102 provides that the nonprofit corporation's bylaws "may contain any provisions for the regulation or management of the affairs of a corporation not inconsistent with the law or the articles of incorporation." Nothing in the nonprofit-corporation statute, or any other statute governing the formation and operation of corporations, prohibits the organizational structure of the Hospital Corporation. On the contrary, we have held that the legislature "is invested with plenary power for all the purposes of civil government," with the state constitution providing certain limitations. *Letford*, 102 Colo. at 300, 79 P.2d at 282. In *Letford*, we considered a challenge to a statute creating a water conservancy district. Although we noted that the district was not a traditional "municipal corporation," the creation of the district did not violate the Colorado Constitution because " 'the state legislature may create *any kind* of a corporation to aid in the administration of public affairs and endow such corporation and its officers with such powers and functions as it may deem necessary.' " *Id.* at 299, 79 P.2d at 282 (emphasis supplied).

In my view, the Regents successfully created a private, nonprofit corporation to carry on the functions of the University Hospital, and to assume the hospital's lia-

bilities. The legislature in this case chose to permit the Regents to create a private nonprofit corporation to carry out the University Hospital functions. The Regents' incidental control over the Hospital Corporation, and the General Assembly's even more attenuated control, is insufficient to transform the Hospital Corporation into a public corporation. Because the Hospital Corporation is not a public corporation, the petitioners' objections under article XI, section 3, and article XII, section 13, of the Colorado Constitution to the corporation's creation must fail.

Accordingly, I respectfully dissent.

Justice ERICKSON dissenting:

The trial court upheld the facial constitutionality of sections 23–21–401 to 23–22–111, 9 C.R.S. (1990 Supp.).[1] The majority, relying on various sections and provisions of the Colorado Constitution, has reversed the trial court and found that the statute is unconstitutional. The Findings of Fact, Conclusions of Law, and Judgment of the trial court are an appendix to this dissent and, in my view, address and properly resolve the issues relating to the University Hospital.

University Hospital was established by the Regents of the University of Colorado pursuant to the Colorado Constitution, which provides:

The establishment, management, and abolition of the state institutions shall be subject to the control of the state, under the provisions of the constitution and such laws and regulations as the general assembly may provide; except that the regents of the university at Boulder, Colorado Springs, and Denver may, whenever in their judgment the needs of that institution demand such action establish, maintain, and conduct all or any part of the schools of medicine, dentistry, nursing, and pharmacy of the university, together with hospitals and supporting facilities and programs related to health, at Denver; ...; and provided further, that subject to prior approval by the general assembly, nothing in this section shall be construed to prevent the state institu-

---

**1.** The trial judge identified the statutory sections    in issue as H.B. 1143.

tions of higher education from hereafter establishing, maintaining, and conducting or discontinuing centers, medical centers, or branches of such institutions in any part of the state.

Colo. Const. art. VIII, § 5.

The wording of article VIII, section 5 reflects the intent of the framers of the constitution to provide the regents with the power to establish, maintain, and operate the University Hospital in the manner directed and authorized by the General Assembly. Economic emergencies confronting the regents in the operation of the University Hospital caused the General Assembly to enact the legislation which the majority has declared to be facially unconstitutional. I believe the General Assembly had the power and authority under article VIII, section 5 to reorganize the University Hospital as a private corporation.

For the reasons so well set forth by the trial judge, I would uphold the constitutionality of the statutes in question.

## APPENDIX

DISTRICT COURT, CITY AND COUNTY OF DENVER, COLORADO

Case No. 89 CV 10176, Courtroom 21

FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT

COLORADO ASSOCIATION OF PUBLIC EMPLOYEES; C.W. PETERSON; SHELLEY OSTREM; JERRY D. ARAGON; DENNIS DEUTSCH; JOYCE SCHULER; SHIRLEY D. BLACKMON; RUTH C. ROBBEN; MARIANNE I. GALENSKY; and JENNIFER M. FRANK,

Plaintiffs,

v.

THE BOARD OF REGENTS OF THE UNIVERSITY OF COLORADO, and each of its members in their official capacities, KATHLEEN ARNOLD; RICHARD BERNICK; ROBERT CALDWELL; PETER DIETZE; LYNN ELLINS; HARVEY PHELPS; NORWOOD ROBB; ROY SHORE; and DAVID WINN,

Defendants.

The Court, having reviewed the briefs and exhibits, having heard the arguments of counsel, and having considered the legislative history of Colorado House Bill 1143 ("H.B. 1143"), hereby enters its findings of fact and conclusions of law as follows:

## GENERAL FINDINGS OF FACT

1. H.B. 1143 was duly enacted by the Colorado General Assembly on April 21, 1989. It authorized the Regents to:

Take all steps necessary to create a private nonprofit-nonstock corporation under articles 20 to 29 of title, 7 C.R.S., which conforms to the requirements of section 23-21-404, for the purpose of operating the hospital. The corporation shall not be an agency of state government, nor be a department or political subdivision thereof. It shall not be subject to any provisions of law affecting only governmental or public entities and, unless otherwise provided in this part 4, shall have all rights and powers of a private nonprofit corporation organized under the laws of this state.

C.R.S. § 23-21-403(1)(a).

2. As part of the University of Colorado's Health Sciences Center, University Hospital has achieved considerable success in its four missions: patient care, research, education and service to the community, especially care to the medically indigent. University Hospital was ranked among the top 25 hospitals in the nation in a 1987 national peer survey. *Facts University Hospital Reorganization, House Bill 1143*, at 2, submitted as Exhibit 2 to Defendant Regents' Brief in Support of the Constitutionality of Colorado House Bill 1143.

3. In the mid-1980s, however, it became apparent that several forces were combining to threaten University Hospital's status as the premiere teaching hospital in the Rocky Mountain Region, threatening its ability to accomplish its mission, and potentially threatening its very existence. Several of these threatening forces were external: the dramatic increase in competition

for patient care and resulting competition in the employment marketplace for health care professionals; the greatly increased need for capital expenditures to provide state-of-the-art medical technology; and increasing reluctance by employers and governmental insurers to subsidize care for the medically indigent through traditional cost-shifting measures.

4. University Hospital's status as a state entity severely restricted its ability to respond to these changes in the health care marketplace. Among the more significant limitations caused by University Hospital's status as a state entity were:

1. The constitutional inability to participate in beneficial joint ventures with private hospitals;

2. The inability to participate in hospital purchasing pools because of state procurement regulations;

3. The inability to build capital reserves or borrow money for investment and hospital improvements, equipment and medical services;

4. The resulting inability to establish new programs and therefore to attract leading specialists and research grants to the health sciences center; and

5. The inability to pay wages competitive with the private sector, especially for nursing care because of constraints caused by the state personnel system on paying wages.

5. The limitation on University Hospital's ability to pay wages competitive with the private sector reached crisis proportions in July 1988, when 284 nurses submitted their resignations in a dispute with the Hospital over compensation. These resignations were withdrawn only after emergency executive action by the Governor of Colorado, which resulted in the Hospital being able to offer a 7½% pay increase to its nursing staff.

6. Unable to pay a competitive wage, the University was required to contract with private nursing pools to provide nurses to the Hospital on a temporary basis.

Prior to reorganization, University Hospital paid approximately $31 per hour for pool nurses, whereas the average pay rate for its nurses under the state personnel system was $14 to $15 per hour. Many of University Hospital's nurses reduced the hours they worked as employees of the Hospital, or have quit the Hospital entirely, in order to obtain employment with nursing pools because they could be paid a higher wage by the nursing pool. This situation resulted in University Hospital paying $3.8 million for nursing pool services in 1988, while it was prohibited from paying its nurses directly at a wage scale commensurate with other hospitals in the community. The use of pool nurses also created significant additional training burdens for the Hospital because it is more difficult to maintain the required consistency of procedures and treatment practices with a heavy dependency upon temporary nurses.

7. Additionally, University Hospital has been called upon by the state to provide increasing amounts of uncompensated medically indigent ("MI") care. In 1988–89 University Hospital's unreimbursed MI programs cost was approximately $7.4 million dollars.

8. The combined forces of increased competition for patient care, inability to pay competitive wages to attract and hold professional staff, increasing requirements to provide uncompensated medically indigent care and the inability to borrow money to acquire state-of-the-art equipment necessary to maintain accredited graduate medical education programs and to attract private paying patients, threatened the ability of University Hospital to fulfill its four-fold mission and threatened its long-term existence.

9. The recommendation to transfer the assets and liabilities of University Hospital to a private nonprofit corporation was made with the benefit of the experience of at least four state academic health centers which have reorganized as private nonprofit corporations: the Universities of Arizona, Florida, Maryland, and West Virginia.

10. H.B. 1143 was the subject of substantial legislative scrutiny and debate. The legislative history of H.B. 1143, consisted of four days of committee hearings and three days of floor debate. Each argument in favor of and in opposition to H.B. 1143 received a full airing before final passage of the legislation.

11. In enacting H.B. 1143 the General Assembly expressly found that:

a. The mission of the hospital established by part 1 of this article is to facilitate and support the education, research, and public service activities of the health sciences schools operated by the regents of the university of Colorado and to provide patient care, including care for the medically indigent, and specialized services not widely available elsewhere in the state and region.

b. In order to provide for the education and training of health care professionals, to provide a clinical setting for biomedical research, to ensure the availability of quality patient care including specialized medical services not otherwise widely available, and to provide for the care and treatment of the medically indigent, it is necessary that the hospital be a facility of the finest possible quality.

c. The present hospital, known as the university of Colorado university hospital, is unable to become and remain economically viable because it is subject to various kinds of government policy and regulation.

d. Unless the hospital can become and remain economically viable, it will become ever more dependent upon state subsidies, and the quality of medical service and education will inevitably decline.

e. The needs of the citizens of the state of Colorado and of the university of Colorado health sciences schools will be best served if the hospital is reorganized to operate as a private nonprofit corporation charged with the mission of operating a teaching hospital for the benefit of the health sciences schools and providing care for the medically indigent.

12. Plaintiffs have abandoned all claims except claims relating to the facial constitutionality of H.B. 1143. The parties have stipulated that this case is to be submitted on their briefs, exhibits and oral arguments as to the constitutionality of H.B. 1143.

## BURDEN OF PROOF AND RULES OF CONSTRUCTION

13. "Statutes are presumed to be constitutional, and a party asserting that a particular statute is unconstitutional assumes the burden of establishing such assertion *beyond a reasonable doubt.*" *Anderson v. State Dep't of Personnel,* 756 P.2d 969, 975 (Colo.1988) (emphasis added). *Accord Urbish v. Lamm,* 761 P.2d 756, 767 (Colo. 1988); *Mr. Lucky's, Inc. v. Dolan,* 197 Colo. 195, 591 P.2d 1021 (1979); *Mosko v. Dunbar,* 135 Colo. 172, 309 P.2d 581 (1957); *People ex rel. Colorado State Hosp. v. Armstrong,* 104 Colo. 238, 90 P.2d 522 (1939); *People ex rel. Thomas v. Goddard,* 8 Colo. 432, 7 P. 301 (1885).

14. "The burden of proof to overcome the presumption of constitutionality of a statute is extremely high where the challenge is to the facial validity of the statute, and there is no potential inhibition of fundamental freedoms such as freedom of speech." *Beathune v. Colorado Dealer Licensing Bd.,* 198 Colo. 483, 601 P.2d 1386, 1387–88 (1979).

15. "Among the cardinal principles to be applied when construing a constitution are those which tell us that a legislature is supreme in legislative matters except as its power is limited by a constitutional provision, and that doubts and ambiguities are to be resolved in favor of the constitutionality of an act." *In re Interrogatories by the Colorado State Senate, Forty–Sixth Gen. Assembly,* 168 Colo. 558, 452 P.2d 391, 393 (1969).

16. The Court is "not authorized to read into a statute an intention on the part of the legislature to exceed its constitutional powers unless the words used are such that under no reasonable construction such intention can be excluded." *Public Utils. Comm'n v. Manley,* 99 Colo. 153, 165, 60 P.2d 913, 919 (1936). The good faith of the

Legislature in enacting a statute must be presumed. *People v. Morgan*, 79 Colo. 504, 507, 246 P. 1024 (1926). It will not be presumed that the Legislature acted unlawfully. *People v. Texas Co.*, 85 Colo. 289, 296, 275 P. 896 (1929).

17. It is well established that this Court must review H.B. 1143 from the perspective that the power of the General Assembly is plenary:

> State constitutions, unlike the federal constitution, are not *grants* of power to the legislative branch of government. Because *state legislatures have plenary power for all purposes of civil government,* state constitutions are *limitations* upon that power.... *We therefore ask, not if the Act's [provisions] are authorized, but if they are prohibited.*

*Colorado State Civil Serv. Employees Ass'n v. Love*, 167 Colo. 436, 448 P.2d 624, 628–29 (1968) (emphasis added in part).

## FINDINGS AND CONCLUSIONS REGARDING THE PRIVATE NATURE OF THE REORGANIZED UNIVERSITY HOSPITAL

18. H.B. 1143 expressly contemplates that the reorganized Hospital be a private nonprofit corporation. The Legislative Declaration to H.B. 1143 specifically finds:

> The needs of the citizens of the state of Colorado and of the university of Colorado health sciences schools will be best served if the hospital is reorganized to operate as a private nonprofit corporation charged with the mission of operating a teaching hospital for the benefit of the health sciences schools and providing care for the medically indigent.

C.R.S. § 23–21–401(1)(e).

19. H.B. 1143 does not itself create a nonprofit corporation, but rather authorizes the Regents to:

> Take all steps necessary to create a private nonprofit-nonstock corporation under articles 20 to 29 of title 7, C.R.S., which conforms to the requirements of section 23–21–404, for the purpose of operating the hospital. The corporation shall not be an agency of state government, nor a department or political subdivision thereof. It shall not be subject to any provisions of law affecting only governmental or public entities and, unless otherwise provided in this part 4, shall have all rights and powers of a private nonprofit corporation organized under the laws of this state.

C.R.S. § 23–21–403(1)(a). H.B. 1143 defines the "corporation" as "the private nonprofit non-stock corporation created for the purpose of operating University Hospital." C.R.S. § 23–21–402(3). The legislative history also makes it clear that the reorganized Hospital is intended by the General Assembly to be a private corporation. *See, e.g.,* Legislative History, Vol. 6 at p. 459, 11. 3–5.

20. Thus, the expressed intent of the legislature is that the reorganized Hospital be a private corporation formed under the general law relating to Colorado nonprofit corporations. The expressed intent of the legislature is entitled to reverent weight by this Court. *Allardice v. Adams County,* 173 Colo. 133, 476 P.2d 982, 989 (1970).

21. In H.B. 1143, the General Assembly has limited the authority of the Regents by precisely defining the attributes of the private nonprofit corporation to which the Regents may transfer the assets of University Hospital. *See* C.R.S. § 23–21–403(1)(a) and § 23–21–404. The General Assembly has authority under Article VIII, Section 5 of the Colorado Constitution to impose these restrictions upon the Regents. *See Uberoi v. University of Colorado,* 686 P.2d 785 (Colo.1984); *Associated Students of University of Colorado v. Regents,* 189 Colo. 482, 543 P.2d 59 (1975).

22. At the time of enactment of H.B. 1143 University Hospital's assets were state assets. The General Assembly unquestionably has authority to specify the conditions under which these assets may be transferred. The General Assembly, pursuant to its plenary police power, may also impose constraints upon and limit the functions of a corporation. *Queen v. West Virginia Univ. Hosps., Inc.,* 365 S.E.2d 375, 380 (W.Va.1987). Article XV, Section 3 of the Colorado Constitution recognizes an in-

dependent legislative power of the General Assembly to alter, revoke or annul upon condition, any part of a corporate charter, so long as it is just to the incorporators. *Platte & Denver Canal Milling Co. v. Dowell,* 17 Colo. 376, 30 P. 68 (1892), *appeal dismissed,* 154 U.S. 512, 14 S.Ct. 1150, 38 L.Ed. 1079 (1893). This power is expressly reserved to the General Assembly with respect to nonprofit corporations under C.R.S. § 7–20–107.

23. H.B. 1143 further provides that the private corporation cannot be transferred to any other entity except the Regents, and that upon dissolution the corporate assets revert to the Regents. C.R.S. § 23–21–404(1)(f) and (g). In authorizing the Regents to transfer the assets of University Hospital to a private nonprofit corporation, the legislature may properly prescribe the conditions of the transfer. Transfers of property to private corporations containing a reversionary interest are not exceptional. In fact, C.R.S. § 7–26–103[ (1) ](c) recognizes that assets held by a nonprofit corporation are frequently "held upon a condition requiring return."

24. The Board of Directors and management of the private nonprofit corporation organized to receive the assets and liabilities of University Hospital have direct and immediate responsibility for the Hospital's day-to-day affairs. Subject to the conditions on transfer imposed by H.B. 1143, the corporation has the general powers conferred upon a nonprofit corporation pursuant to C.R.S. § 7–22–101, such as the right to sue and be sued, to purchase or lease real or personal property, to sell, convey, or pledge its property and assets, to hold interests in other corporations, partnerships or joint ventures, to make contracts, incur liabilities, borrow money and severally control its own affairs. For example, H.B. 1143 amends C.R.S. § 23–22–104, C.R.S., relating to the psychiatric hospital, to provide expressly:

> The board of regents of the university of Colorado shall have full control and supervision of all the property and grounds and buildings of the hospital and shall have the entire government and management of the same *exclusive of any property transferred to a private corporation pursuant to part 4 of article 21 of this title.*

(emphasis added).

25. The Court finds that none of the restrictions upon the form of the nonprofit corporation and none of the conditions imposed upon the transfer of property to the corporation, deprive the corporation of its private nonprofit status.

26. Plaintiffs cite *Queen v. West Virginia Univ. Hosps., Inc.,* 365 S.E.2d 375 (D.Va.1987) in support of their contention that the reorganized Hospital is the state. On the contrary, *Queen* found that the reorganized West Virginia University Hospital was not a political subdivision of the state, a state agency, or a public corporation. *See id.* at 383, and *id.* at 383 n. 5.

27. *Queen* did find that the reorganized West Virginia Hospital was a "public body" as defined in West Virginia's Freedom of Information Act, and that the reorganized West Virginia University Hospital was a "public actor" for due process purposes under the 14th Amendment of the United Constitution. However, the instant case challenges only the facial constitutionality of H.B. 1143, and does not raise any issue with respect to either the records of the reorganized Hospital or any alleged violation of due process. The issue of whether the reorganized University Hospital is a "state actor" for due process purposes, is not before this Court. The Court rejects Plaintiffs' contention, however, that because the reorganized Hospital might be a "state actor" for Fourteenth Amendment due process purposes, it must be deemed the "state" for all purposes, as being illogical and contrary to case law. *See Queen.*

28. The Court further finds that H.B. 1143 does not violate Article XV, Section 2 of the Colorado Constitution, prohibiting the creation of private corporations by special legislation. Article XV, Section 2 provides:

> No charter of incorporation shall be granted, extended, changed or amended

by special law, except for such municipal, charitable, educational, penal or reformatory corporations as are or may be under the control of the state; but the general assembly shall provide by general laws for the organization of corporations hereafter to be created.

West Virginia's constitution contains a mirror image of Colo.Const. art. XV, § 2:

The legislature shall provide for the organization of all corporations hereafter to be created ... but no corporation shall be created by special law.

W.Va.Const. art. XI, § 1. Interpreting West Virginia's constitutional provision in the face of similar allegations, the West Virginia Supreme Court of Appeals states:

We think that a detailed analysis of the cited constitutional sections would not prove particularly helpful to us, since, from the records of the constitutional debates, it is clear that in adopting the precursors to current article XI, section 1 and article X, section 6 of the West Virginia Constitution the framers were exclusively concerned with stock corporations formed for profit making purposes, which is not the case here.

*Queen*, 365 S.E.2d at 380.

The history of the Colorado Constitutional Convention of 1975 shows that in Article XV, Section 2, the drafters of the Colorado Constitution also were concerned with stock corporations formed for profit making purposes, particularly railroads, and only sought to prohibit the legislature from creating corporations with special privileges and prerogatives:

Probably no subject has come before the Convention causing more anxiety and concern than the troublesome and vexed question pertaining to corporations. The Legislatures of other States have, in most cases, been found unequal to the task of preventing abuses *and protecting the people from the grasping and monopolizing tendencies of railroads and other corporations.* Experience has shown that positive restrictions on the powers of the Legislature in relation to these matters are necessary.

*To this end we have provided for the wiping out of all dormant and sham corporations claiming special and exclusive privileges.* We have denied the general assembly the power to create corporations, or to extend or enlarge their chartered rights by special legislation, or to make such rights and privileges irrevocable; *but in case it be found that the exercise of such rights and privileges proves injurious to the people, then the General Assembly shall have the power to alter, revoke or annul such charters, when that can be done without injustice to the incorporators.*

Address to the People contained in *Proceedings of the Constitutional Convention Held in Denver, December 20, 1875 to Frame a Constitution for the State of Colorado, etc.,* 728 (1907) (emphasis added). The language emphasized above leaves no doubt that Colorado's Constitutional provision, like West Virginia's, is only a limitation on the legislature creating by special enactment private *for-profit* corporations having "special and exclusive privileges." It was not intended to limit the General Assembly's authority to restrict corporate charters.

29. This conclusion is reinforced by Article XV, § 3 of the Colorado Constitution, which provides:

The general assembly shall have the power to alter, revoke or annul any charter of incorporation now existing and revocable at the adoption of this constitution, or any that may hereafter be created, whenever in their opinion it may be injurious to the citizens of the state, in such manner, however, that no injustice shall be done to the corporators.

*See also Platte & Denver Canal Milling Co. v. Dowell,* 17 Colo. 376, 30 P. 68 (1892), *appeal dismissed,* 154 U.S. 512, 14 S.Ct. 1150, 38 L.Ed. 1079 (1893). It is also reinforced by the express provisions of C.R.S. § 7–20–107, which reserves to the General Assembly the power to prescribe such provisions and limitations for nonprofit corporations as it chooses.

30. The Court rejects Plaintiffs' contention that the nonprofit corporation should be considered to be the alter ego of the Regents, because the conditions and restrictions placed upon the transfer of assets and liabilities to the nonprofit corporation are with the General Assembly's power and because there is no evidence or allegation that the nonprofit corporation is to be used to promote an injustice or protect a fraud. *See Gude v. City of Lakewood,* 636 P.2d 691 (Colo.1981). Accordingly, the Court finds that the corporation authorized by H.B. 1143 is a private nonprofit corporation.

## FINDINGS AND CONCLUSIONS REGARDING THE APPLICABILITY OF THE CIVIL SERVICE AMENDMENT

31. H.B. 1143 enacted C.R.S. § 23-21-406 which provides:

(1) Any hospital employee who is a classified employee of the state personnel system on the transfer date shall have the option to become an employee of the corporation or to remain an employee of the state and a member of the state personnel system.

(2) Any hospital employee who elects to remain a member of the state personnel system may remain so for a period of not more than two years, but shall not be eligible to return to the state personnel system as a hospital employee once he has elected to become a corporation employee.

(3) Any hospital employee who elects to remain a member of the state personnel system shall retain all rights and privileges of membership in the state personnel system. In the case of any dispute involving an employee who is a member of the state personnel system, the hospital shall agree to accept resolution of all disciplinary appeals or other employment disputes governed by the statutes of the state personnel system or the rules of the state personnel department according to the rules and procedures applicable to members of the state personnel system.

(4) Any classified employee who elects during the two-year transition period to become an employee of the corporation shall, under the terms of his new employment, receive full credit for sick leave and annual leave accrued as a classified employee.

32. As enacted, H.B. 1143 does not displace any classified employee from the state personnel system. On the other hand, H.B. 1143 gives those employed at University Hospital on the transfer date a right they would otherwise not have: the right to work for up to two years at the private corporation's Hospital without losing any rights they presently enjoy as State employees. If a certified employee elects not to become an employee of the corporation within two years, the employee remains an employee of the State and retains all rights and privileges of membership in the State Personnel System. He simply may no longer work for the Hospital owned by the private corporation.

33. The Civil Service Amendment cannot be read as creating a constitutional right to continued employment at University Hospital after reorganization.

The purpose of civil service legislation is to protect employees from arbitrary and capricious political action and to ensure employment during good behavior. Such protection applies during authorized service. *Civil service tenure, however, is not meant to guarantee duration of employment for any number of set years or over any particular period of time.*

*Coopersmith v. City and County of Denver,* 156 Colo. 469, 399 P.2d 943, 948 (1965) (emphasis added).

34. Article XII, Section 15(3)(a) of the Civil Service Amendment, creating a preference for veterans, contemplates that laying-off classified employees is permitted when there is a "lack of work or curtailment of funds." Similarly, C.R.S. § 24-50-124(1), regarding the reduction of employees under the State Personnel System, contemplates that certified employees may be "separated from State service due

to lack of work, lack of funds, *or reorganization....*" (emphasis added).

35. Further, by its express terms, the Civil Service Amendment applies only to "appointed public officers and employees *of the State....*" Colo.Const. art. 12, § 13(2) (emphasis added). The Colorado Supreme Court has held:

> The language used in the Civil Service Amendment is plain, its meaning clear, and no absurdity is involved. Hence, it must be declared and enforced as written: all officers *of the state* must be under civil service except for certain exceptions which are described in specific terms.

*Colorado State Civil Serv. Employees Ass'n v. Love,* 167 Colo. 436, 448 P.2d 624, 627 (1968) (emphasis added). Having found that the corporation authorized by H.B. 1143 is a private nonprofit corporation, the Civil Service Amendment has no applicability to the reorganized University Hospital.

36. Because H.B. 1143 does not deprive any classified employee of his status as a classified employee, and because employees of the reorganized University Hospital will not be "employees of the state," H.B. 1143 does not violate the Civil Service Amendment.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW WITH REGARD TO ARTICLE XI, SECTION 3

37. Article XI, Section 3 of the Colorado Constitution provides that "[t]he state shall not contract any debt by loan in any form," subject to certain exceptions, none of which is applicable here. The general prohibition upon the creation of "public debt" is designed primarily to prevent a present legislature from irrevocably committing future legislatures to the payment of an obligation. *Glennon Heights, Inc. v. Central Bank & Trust,* 658 P.2d 872, 878 (Colo. 1983). Indications of a "public debt" in the constitutional sense are "that the obligation pledges revenues of future years, that it requires use of revenue from a tax otherwise available for general purposes, that it is a legally enforceable obligation against the state in future years, or that appropriation by future legislatures of monies in payment of the obligation is nondiscretionary." *Id.* at 878–879 (citations omitted).

38. The provision of H.B. 1143 challenged by Plaintiffs provides that the Regents may:

> *Subject to applicable constitutional limitations* and in the *regents' discretion,* issue bonds or otherwise borrow money on behalf of the corporation for any of the corporation's lawful purposes, including the refunding or refinancing of any of the corporation's indebtedness, *to be repaid from the revenues of the corporation.* Any bonds or other instruments of indebtedness shall substantially comply with the requirements of sections 29–3–105 and 29–3–106, C.R.S., applicable to counties and municipalities. The regents may, to facilitate the marketability of bonds issued by the corporation, enter into agreements providing that, *subject to available appropriations,* the regents will make contributions to any reserve fund required to be maintained under the terms of any bonds issued to redress any impairment of the reserve fund. The general assembly specifically finds that financial assistance to the corporation as provided in this paragraph (e) would promote a. substantial public purpose.

§ 23–21–403(1)(e), C.R.S. (emphasis added).

39. It is thus plain on the face of H.B. 1143 that the indebtedness the Regents are authorized to create is not "public debt." H.B. 1143 permits, but by no means obligates, the Regents to issue bonds or borrow money on behalf of the corporation. The Regents' authority to issue bonds and borrow money is expressly limited insofar as the indebtedness must be repaid from the revenues of the private corporation, and not the state. Furthermore, while H.B. 1143 permits the Regents to enter into agreements to make contributions to a bond reserve fund, any such agreements entered into by the Regents must be "subject to available appropriations." Just as the lease/purchase agreement in *Glennon Heights* provided that the State Depart-

ment of Institutions would use its "best efforts" to obtain funding every year for rent payments, the agreements into which the Regents are authorized to enter are "specifically tied to appropriation of sufficient funds.... Nothing in the agreement limits the discretion of the legislature." 658 P.2d at 879. *Accord Gude v. City of Lakewood*, 636 P.2d 691, 699 (Colo.1981) (holding that discretionary or contingent obligations are not constitutional debt). Finally, the authority of the Regents is expressly "subject to applicable constitutional limitations."

40. Further, to the extent Plaintiffs allege that H.B. 1143 violates Article XI, Section 3 because, Plaintiffs argue that the reorganized University Hospital is the state, this Court has found to the contrary. Accordingly, this Court holds that H.B. 1143 does not violate Article XI, Section 3.

### FINDINGS AND CONCLUSIONS OF LAW WITH RESPECT TO ARTICLE XI, SECTION 1

41. Plaintiffs further argue that, if the reorganized corporation is not the state, H.B. 1143 violates Colo. Const. art. XI, § 1. This section provides:

Neither the state, nor any county, city, town, township or school district shall lend or pledge the credit or faith thereof, directly or indirectly, in any manner to, or in aid of, any person, company or corporation, public or private, for any amount, or for any purpose whatever; or become responsible for any debt, contract or liability of any person, company or corporation, public or private, in or out of the state.

Article XI, Section 1 is not violated where there is not, in fact, a pledge of the government's general credit or where a pledge of credit is for a public purpose. *Witcher v. Canon City*, 716 P.2d 445 (Colo.1986).

42. As in *Witcher*, any contractual obligation of the reorganized Hospital is solely that of the private nonprofit corporation and not the state. *See id.*, 716 P.2d at 454. The Regents have no authority to unconditionally pledge the Regents' assets or to

obligate the state to pay any indebtedness of the corporation. C.R.S. § 23–21–403(1)(e). Therefore, H.B. 1143 does not authorize a pledge of the state's credit in violation of Article XI, Section 1.

43. Moreover, H.B. 1143 plainly serves a public purpose. The legislative declaration specifically states:

*The needs of the citizens of the state of Colorado and of the university of Colorado health sciences schools will be best served if the hospital is reorganized to operate as a private nonprofit corporation charged with the mission of operating a teaching hospital for the benefit of the health sciences schools and providing care for the medically indigent.*

(emphasis added). The challenged provision of H.B. 1143 contains an express legislative finding that any financial assistance to the corporation by the Regents would "promote a substantial public purpose." C.R.S. § 23–21–403(1)(e). "Although the expressed intent of the legislature has no magical quality which validates the invalid, it is entitled to reverent weight in determining whether the Act promotes a public purpose." *Allardice v. Adams County*, 173 Colo. 133, 476 P.2d 982, 989 (1970).

44. Where, as here, the challenged legislation plainly serves a public purpose, the provision of health care to the citizens of the state, the prohibitions of Article XI are inapplicable. *See Witcher v. Canon City*, 716 P.2d 445, 455 (Colo.1986); *Gude v. City of Lakewood*, 636 P.2d 691, 695 n. 2 (Colo. 1981); *In re Interrogatories by the Colorado State Senate*, 193 Colo. 298, 306–07, 566 P.2d 350, 356 (1977); *McNichols v. City and County of Denver*, 131 Colo. 246, 280 P.2d 1096 (1955). In considering a substantially similar challenge to a lease transaction between the Arizona Board of Regents and University Medical Center Corporation, the Arizona Supreme Court, after reviewing the structure of the reorganized University Hospital, held, "In the instant case, it cannot be seriously contended that the existence of UMCC as a nonprofit hospital does not serve a public purpose." *Kromko v. Arizona Bd. of Regents*, 149 Ariz. 319, 718 P.2d 478, 480 (1986). *Accord Queen v.*

*West Virginia Univ. Hosps., Inc.*, 365 S.E.2d 375, 381 (W.Va.1987) (quoting *Kromko* with approval). The Court concurs with the analysis of *Kromko* that H.B. 1143 plainly serves a public purpose within the meaning of Article XI of the Colorado Constitution, as interpreted by the decisions of the Colorado Supreme Court.

## ABANDONED CLAIMS

45. The Court finds that Plaintiffs have abandoned their claims that H.B. 1143 violates Colo. Const. art. V, § 34 or art. XI, § 2, that it constitutes an unconstitutional impairment of contractual obligations, that it violates due process, and that Plaintiffs have abandoned their claims under 42 U.S.C. § 1983.

## CONCLUSIONS AND JUDGMENT

46. The power of the General Assembly is plenary, unless specifically limited by the Constitution. The constitutionality of H.B. 1143 is presumed unless Plaintiffs demonstrate unconstitutionality beyond a reasonable doubt. Plaintiffs have failed to meet their burden of proof.

47. Accordingly, this Court declares that H.B. 1143 is constitutional, and judgment is entered in favor of Defendants and against Plaintiffs. Costs shall be taxed as provided for in the Colorado Rules of Civil Procedure.

DATED this 31st day of October, 1989.

/s/ George B. Lee, Jr.
George B. Lee, Jr.
District Court Judge