John N. DEMPSEY, Frank Abel, Richard J. Adamich, Gary E. Angerhofer, Anthony Aragon, William Archambault, Harvey Atchison, Carlos Baca, Arthur L. Barnhart, Joseph N. Basquez, Bradley J. Beckham, Johan J. Bemelen, Donna Sue Bishop, William R. Borchelt, Dwight M. Bower, Gary G. Broetzman, Raymond Q. Brown, Homer L. Bruton, Amelie Buchanan, Ronald L. Cada, Gary D. Cammarata, Raymond A. Cardy, Jim L. Cleek, Robert L. Clevenger, John E. Conger, Kenneth R. Conyers, Thomas I. Cooper, James R. Davis, Peter Dawson, Joseph R. Demko, Warren T. Diesslin, Dennis W. Donald, John A. Duncan, L.G. Earl Duncan, Larry Embry, Glenn W. Fritts, Pricilla H. Gallegos, H. Conway Gandy, Richard D. Georgeson, Patsy D. Goodman, Daniel J. Gossert, Ronald H. Granner, Clifford W. Hall, Thomas L. Hancock, Dee Ellis Hartman, Harold W. Henson, Robert L. Henson, Christian E. Hinz, John David Holm, Patrick C. Horton, Kenneth L. Howard, Larry D. Huls, Mi-

chael H. Hurtado, Kenneth H. Hutcheson, John Ivy, William H. Jackson, Kailash N. Jaitly, Harry B. Johnson, John P. Kelly, Joseph O. Kendall, George M. Kerin, Don C. Kirkpatrick, Dennis L. Kleinsasser, John T. Leary, James F. Lipcomb, Robert A. Longenbaugh, Thomas P. Looby, Kenneth MacNeil, Albert Martinez, Kenneth F. Mauro, Guy A. Mayo, George Meares, Sharon L. Michael, Ted V. Middle Jr., Richard G. Mills, John E. Mohatt, Gloria V. Morgan, Kris Moser, Robert P. Moston, Maryann Motza, Richard L. Noble, Bonnie M. Orkow, Austin Paitt, Harold E. Parker, John J. Perko, Robert M. Quillin, Douglas D. Rames, William Rayner, Donald Rice, J. Frank Rice, Elizabeth J. Ricker, Kaylon E. Roberts, David L. Ross, Jerry C. Schade, Philip E. Seymour, Alfred A. Shablo, Douglas Shaffer, David C. Shelton, Angelo Joseph Siccardi, James E. Siebels, Pamela Sillars, Robert L. Smith, William V. Speckman, W.G. Stringfellow, Lewis F. Sturm, Robert I. Sullivan, Robert L. Sutherland, Marie A. Swigert, Tom E. Talmadge, Robert S. Telkits, Edward M. Tormohlen, John M. Unbewust, Philip A. Vasques, Guillermo V. Vidal, Linda B. Waldman, Elizabeth Walton, Bill Wills, Jerome L. Wilson, William Wilson, Dennis J. Wolfard, Lyle B. Wullbrandt, James A. Yarrington, Daryl R. Yeates, Walter F. Young, and Nancy Zurbuch, Plaintiffs–Appellants,

v.

Roy ROMER, in his official capacity as the Governor of Colorado, Jo Ann Soker, in her official capacity as the Executive Director of the Colorado Department of Personnel, the Colorado Department of Personnel, Defendants–Appellees.

No. 91SA9.

Supreme Court of Colorado,
En Banc.

Feb. 3, 1992.

Rehearing Denied March 10, 1992.

Jon L. Holm, Denver, for plaintiffs-appellants.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Michael P. Serruto, Asst. Atty. Gen., Denver, for defendants-appellees.

Justice KIRSHBAUM delivered the Opinion of the Court.

Appellants, employees of the State of Colorado (employees), filed a declaratory judgment action in the District Court in and for the City and County of Denver against appellees, Roy Romer, the Governor of Colorado, and Jo Ann Soker, the Executive Director (the director) of the Colorado Department of Personnel (the Department). The complaint alleged, *inter alia*, that section 24–50–104(6), 10B C.R.S. (1988), establishing a maximum monthly salary level payable to the employees, violates article XII, sections 13, 14, and 15 of the Colorado Constitution and the Fourteenth Amendment to the United States Constitution. Rejecting the employees' claims, the trial court entered summary judgment on behalf of the appellees, and the employees have appealed that judgment. We affirm.

## I

### A

In this appeal the employees assert that section 24–50–104(6), 10B C.R.S. (1988), violates article XII, section 13(8), of the Colorado Constitution and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. They also contend that article XII, sections 13 and 14, of the Colorado Constitution in essence grant exclusive authority to the director to establish the levels of compensation payable to persons employed in the state personnel system (hereafter referred to as state employees) commensurate with job classifications and grades certified by the director. The employees finally suggest that the current statutory scheme authorizing the director to establish pay plans justified by salary surveys prohibits the General Assembly from establishing specific salary limitations applicable to particular grades. Prior to resolving these significant questions concerning the constitutional and statutory authority of the director and of the General Assembly to establish levels of compensation of state employees, it is appropriate to consider in general the evolution of this state's institutional responses to issues associated with hiring, retaining and compensating state employees.

Until 1919 the General Assembly controlled the employment and compensation of state employees by enacting special legislation establishing positions, pay grades and compensation levels. *See, e.g.,* ch. 24, sec. 1, 1903 Colo. Sess. Laws 58–64; ch. 157, sec. 3, 1915 Colo. Sess. Laws 448, 449; ch. 45, sec. 21, 1917 Colo. Sess. Laws 136, 137. However, in 1918 the electorate approved an initiative amending the Colorado Constitution to ensure the creation of an executive agency with constitutional authority to develop and administer a merit-based system of state employment. *Colorado Ass'n of Pub. Employees v. Department of Highways*, 809 P.2d 988, 991 (Colo.

1991); *Colorado State Civil Serv. Employees v. Love*, 167 Colo. 436, 446, 448 P.2d 624, 628 (1968). The initiative called for the creation of a Civil Service Commission with authority to appoint, promote, discipline and discharge state employees "according to merit and fitness, to be ascertained by competitive tests of competence." Ch. 102, 1919 Colo. Sess. Laws 341, 342–43.[1] It further provided that state employees "shall be graded and compensated according to standards of efficient service which shall be the same for all persons having like duties"; that "[l]aws shall be made to enforce the provisions of [the amendment]"; and that "[a]dequate appropriations shall be made to carry out the purposes of [the amendment]. . . ." *Id.*

Upon its adoption, the initiative was designated as article XII, sections 13 and 14, of the Colorado Constitution. These constitutional provisions remained in effect until 1970, when the current provisions of article XII, sections 13, 14 and 15 were adopted by the electorate, effective 1971.[2]

In response to the 1918 initiative, the General Assembly enacted legislation establishing a Civil Service Commission and granting it broad authority to classify positions and establish pay grades for state employees. 1921 Compiled Laws of Colorado, ch. 9, sec. 131. From 1919 to 1947, the General Assembly periodically established levels of compensation for identified positions within the civil service system.[3] In 1947, it adopted a compensation plan for all classified civil service positions that contained twenty-four salary grades with corresponding salaries ranging from $130 to $625 per month. Ch. 189, secs. 1–2, 1947 Colo. Sess. Laws 453–54. Statutes altering the number of grades, increasing the sala-

ry level for each grade, and ultimately establishing different steps with corresponding pay levels were adopted in 1949, 1953, 1957, 1959 and 1967. Ch. 162 secs. 1–10, 1949 Colo. Sess. Laws 409–10; ch. 103, secs. 1–2, 1953 Colo. Sess. Laws 289–90; ch. 97 sec. 1, § 26–2–3, 1957 Colo. Sess. Laws 292; ch. 80, secs. 1–2, § 26–2–3, 1959 Colo. Sess. Laws 309–310; ch. 124, sec. 1, § 26–1–2, 1967 Colo. Sess. Laws 154, 155.

The 1970 constitutional revisions were designed to delineate the ministerial and policy-making functions incident to the administration of the state personnel system. *Colorado Ass'n of Pub. Employees v. Board of Regents*, 804 P.2d 138 (Colo.1990). They called for the creation of a new executive agency, the Department, headed by a director responsible for administering the state personnel system and for the creation of a five-person State Personnel Board functioning primarily as a policy-making and appeals entity. *See* "Legislative Council of the General Assembly Analysis of 1970 Ballot Proposals," Research Publication No. 151 (1970). The 1970 constitutional amendments also provided that "[a]dequate appropriations shall be made to carry out the purposes of [article XII, §§ 13, 14]." Colo. Const. art. XII, § 14(5).

In 1972, pursuant to the revised constitutional amendments, the General Assembly adopted legislation reorganizing all salary grades, establishing a chart of minimum and maximum salaries for all such grades, and establishing a maximum salary level. Ch. 38, sec. 1, § 26–1–4, 1972 Colo. Sess. Laws 158, 161–68. In 1973, legislation was adopted deleting the chart of minimum and maximum salaries, authorizing the director

---

1. The initiative defined the classified civil service to include all appointed officers and employees of the state, with certain exceptions for particular judicial and legislative officers and employees.

2. In 1944, the electorate adopted an amendment to article XII, section 14, relating to preferential treatment of veterans in filling vacancies in the classified civil service.

3. In 1931, salaries were established for all "stenographers, clerks, bookkeepers, registrars, typists, clerk-typists, inspectors, file-clerks, messengers, computers and assistant multigraph operators." Ch. 156, sec. 1, 1931 Colo. Sess. Laws 740. In 1935, salaries were set for elevator pilots, Ch. 202, secs. 1–2, 1935 Colo. Sess. Laws 1048. In 1941, salaries for several different officials were specified. Ch. 2, secs. 6, 9, 1941 Colo. Sess. Laws 35–43. In 1943, the salaries of all state employees were increased by a specific percentage. Ch. 98, secs. 2–5, 1943 Colo. Sess. Laws 245–247.

to establish pay plans [4] for state employees under certain policy criteria, and establishing a "maximum monthly salary" of $3,227 for state employees. Ch. 119, secs. 1 & 2, § 26–1–4(1)–(5), 1973 Colo. Sess. Laws 421, 423; ch. 119, sec. 3, § 26–1–4(6), 1973 Colo. Sess. Laws 421, 423, § 24–50–104(1)–(6), 10 C.R.S. (1973). All subsequent legislation authorizing the director to develop pay plans has contained a maximum monthly salary provision. In 1980, the maximum monthly salary level was set at $4,872. Ch. 116, sec. 1, § 24–50–104(6), 1980 Colo. Sess. Laws 600.

The statutory scheme applicable here requires the director to establish classifications of different positions within the state personnel system. § 24–50–104(3)(a), 10B C.R.S. (1988). A position consists of particularly defined duties and responsibilities. A class consists of one or more positions sufficiently similar in duties, responsibilities, complexity of tasks and required skill, knowledge and ability to justify the establishment of identical requirements of education and experience and the administration of identical competitive tests. Each class and each position within a class is accorded a different grade of pay as established by the director pursuant to a pay plan for state employees. § 24–50–104(6), 10B C.R.S. (1988).

In developing compensation policies, the director is required to utilize the results of annual salary surveys to determine pay grades, salary rates and salary ranges for classified positions comparable to levels of compensation prevailing for similar positions in public and private employment. §§ 24–50–104(2)(a) and –104(3)(e), 10B C.R.S. (1988). The director is also required to recommend salary adjustments to the Governor "by pay plans developed in accordance with [section 24–50–104(6) ]." § 24–50–104(5)(d), 10B C.R.S. (1988). The Governor is required to submit the director's report, together with estimated costs of salary adjustments, to the Joint Budget Committee of the General Assembly. § 24–50–104(5)(g)(I), 10B C.R.S. (1988).

 At the time this civil action was initiated, the state personnel system recognized 1,559 separate job classifications and, effective January 1, 1990, sixty-one salary grades numbered 39 through 99. Employees compensated at grade 99, the highest authorized pay grade, received a salary of $4,872 per month, the maximum salary permitted by section 24–50–104(6), 10B C.R.S. (1988).[5] According to the parties, a pay

---

**4.** The relevant statutes refer to the director's responsibility to establish "compensation" plans, § 24–50–104(2)(b), 10B C.R.S. (1988), and "pay" plans, § 24–50–104(6), 10B C.R.S. (1988). The parties have not suggested any distinction between the terms.

**5.** At the time the complaint herein was filed, § 24–50–104(6) stated as follows:

(6) **Pay plans.** There shall be established by the state personnel director pay plans for employees in the state personnel system; except that the maximum monthly salary for any such employee shall not exceed four thousand eight hundred seventy-two dollars. Such plans shall be designed in order to implement the policies of the state as set forth in subsection (2), paragraph (e) of subsection (3), and subsection (5) of this section. The state personnel director shall assign and may reassign classes of positions to such plans, subject to the provisions of this article.
§ 24–50–104(6), 10B C.R.S. (1988).
On May 24, 1991, the General Assembly amended § 24–50–104(6) to delete the provision establishing a maximum monthly salary level of $4,872. Ch. 153, secs. 1–2, §§ 24–50–104(5)–(6);

1991 Colo. Sess. Laws 853–56; § 24–50–104(6), 10B C.R.S. (1991 Supp.). In addition, § 24–50–104(5)(g)(VII) was amended to read in pertinent part as follows:

(VII) ... [B]eginning January 1, 1992, the pay grade assigned to any class of positions assigned to grade 99 on or after June 30, 1991, shall be one-half the difference between grade 99 and the pay grade recommended for such class pursuant to this paragraph (g), subject to a maximum monthly salary of five thousand six hundred forty dollars; except that such maximum monthly salary for classes requiring licensure as a physician or dentist shall be six thousand two hundred fifty dollars.... [T]he maximum monthly salary for any employee whose position is assigned to a pay plan in effect prior to July 1, 1991, shall be six thousand two hundred eighteen dollars; except that classes requiring licensure as a physician or dentist shall not be subject to such maximum monthly salary.... [E]ach fiscal year thereafter, such amount shall be adjusted by the state personnel director in accordance with the change in the consumer price index for the Denver–Boulder metropolitan statistical area for the preceding calendar year or

plan based on the results of the 1989–90 salary survey utilized by the director would have included several additional job classifications and new salary grades, the implementation of which would have required payment of salaries in excess of $4,872 per month to the employees.[6]

### B

In their complaint, the employees alleged that article XII, section 13(8), of the Colorado Constitution not only prohibits payment of different compensation to persons having similar duties but also prohibits payment of identical compensation to persons having dissimilar duties.[7] They further asserted that article XII, section 13(8), requires the General Assembly to appropriate sufficient sums to compensate state employees at the salary levels justified by the results of the annual salary surveys utilized by the director and that section 24–50–104(6), 10B C.R.S. (1988), violates that requirement of Colorado's Constitution as well as the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. The employees

sought injunctive relief requiring the General Assembly to appropriate funds in an amount sufficient to implement fully the salary levels justified by the results of the director's 1989–90 salary survey.

The appellees filed a motion for summary judgment, asserting that the General Assembly possesses ultimate constitutional authority to adopt legislation establishing maximum salary levels for state employees and that section 24–50–104(6), 10B C.R.S. (1988), does not violate state or federal constitutional provisions. The employees filed a cross-motion for summary judgment on their claims. The trial court ultimately entered an order granting the appellees' motion and denying the employees' motion. The trial court concluded that the General Assembly possesses constitutional authority to appropriate funds for the purpose of compensating state employees, that article XII, section 13(8), of the Colorado Constitution does not prohibit payment of identical compensation to state employees performing dissimilar duties, and that section 24–50–104(6), 10B C.R.S. (1988), does not violate equal protection standards.

the percentage increase in state general fund appropriations in relation to such appropriations for the preceding fiscal year, whichever is less....

§ 24–50–140(5)(g)(VII), 10B C.R.S. (1991 Supp.)

It is arguable that these amendments have rendered this case moot. A case becomes moot when any judgment rendered therein can have no practical effect upon the controversy. *Van Schaack Holdings, Ltd. v. Fulenwider*, 798 P.2d 424 (Colo.1990); *Barnes v. District Court*, 199 Colo. 310, 607 P.2d 1008 (1980); *see Lininger v. City of Sheridan*, 648 P.2d 1097 (Colo.App.1982). However, a case requiring adjudication of questions of great public importance or of constitutional significance of a recurring nature that might otherwise escape judicial review may be considered even if for all practical purposes it has become moot. *Consumer Counsel v. Mountain States Tel. & Tel. Co.*, 816 P.2d 278, 281 n. 5 (Colo.1991); *Colorado–Ute Elec. v. Public Utils. Comm'n*, 760 P.2d 627, 633 (Colo.1988); *Bestway Disposal v. Public Utils. Comm'n*, 184 Colo. 428, 520 P.2d 1039, 1040 (1974). The questions raised herein concerning the authority of the General Assembly and of the director to establish maximum salary levels of state employees are of public importance, require adjudication of constitutional issues and may well reoccur but escape judicial review. We therefore do not dismiss the appeal as moot.

**6.** The record on appeal does not contain copies of the 1989–90 salary survey, the recommendations submitted by the director to the Governor for fiscal year 1990, or the recommendations submitted by the Governor to the Joint Budget Committee for fiscal year 1990. The parties rely on a document which the trial court found contained "theoretical" salary levels based on the 1989–90 salary survey for their apparent agreement, for purposes of summary judgment, that had the results of the director's 1989–90 salary survey been implemented, the employees would have received monthly salaries in excess of $4,872. According to the uncontradicted affidavit of Kenneth Allikian, manager of the Department's Classification and Compensation Division, that document is a printout derived from a Department data file.

**7.** The provision states in pertinent part as follows:

(8) Persons in the personnel system of the state shall hold their respective positions during efficient service or until reaching retirement age, as provided by law. They shall be graded and compensated according to standards of efficient service which shall be the same for all persons having like duties....

Colo. Const. art. XII, § 13(8).

## II

The employees assert that insofar as section 24–50–104(6), 10B C.R.S. (1988), purports to establish a maximum monthly salary level, it violates the provisions of article XII, section 13(8), of the Colorado Constitution requiring that state employees "shall be graded and compensated according to standards of efficient service which shall be the same for all persons having like duties." Colo. Const. art. XII, § 13(8). They contend that this constitutional language in effect prohibits payment of identical salaries to persons performing dissimilar duties. We reject this argument.

The General Assembly enjoys broad legislative responsibility under our constitution to raise and spend funds for governmental purposes. *Colorado Ass'n of Pub. Employees v. Lamm,* 677 P.2d 1350, 1353 (Colo.1984); *Groditsky v. Pinckney,* 661 P.2d 279, 282 (Colo.1983); *Colorado State Civil Serv. Employees v. Love,* 167 Colo. 436, 447, 448 P.2d 624, 628 (Colo. 1968). Of course, this general authority must be exercised in conformity with express or implied restraints imposed thereon by specific constitutional provisions. *Colorado Ass'n of Pub. Employees v. Lamm,* 677 P.2d at 1353; *People v. Y.D.M.,* 197 Colo. 403, 593 P.2d 1356 (1979). Statutes are presumed to be constitutional, and a party asserting that a particular statute violates constitutional provisions assumes the burden of establishing such assertion beyond a reasonable doubt. *Anderson v. State Dep't of Personnel,* 756 P.2d 969, 975 (Colo.1988). Furthermore, if language of a constitutional provision conveys a clear and definite meaning involving no absurdity or internal contradiction, any construction of such language must give full effect to that meaning. *Colorado State Civil Serv. Employees Ass'n v. Love,* 167 Colo. 436, 445, 448 P.2d 624, 627 (1968).

Article XII, section 13(8), of the Colorado Constitution provides that state employees performing "like" or similar servic-es must be graded and compensated according to the same standards. It thus prohibits preferential compensation treatment for persons equally qualified who perform substantially similar services. The provision neither expressly nor by necessary implication prohibits payment of identical compensation to state employees performing unlike or dissimilar services. This construction is consistent with the conclusion this court reached in *Vivian v. Bloom,* 115 Colo. 579, 587, 177 P.2d 541, 545 (1947), wherein we rejected an argument similar to the employees' assertion here in construing the predecessor of article XII, section 13(8). We find the rationale of *Vivian* persuasive with respect to the construction of the current constitutional language.

## III

The employees next contend that article XII, sections 13 and 14, of the Colorado Constitution in essence grant the director authority to establish the levels of compensation payable to state employees by virtue of the director's authority to certify classifications and grades, therefore prohibiting the General Assembly from establishing maximum monthly salary levels for particular pay grades. They also suggest that the current statutory scheme authorizing the director to establish pay plans justified by salary surveys prohibits the General Assembly from establishing specific salary limitations applicable to particular grades. We disagree.

### A

The argument that the director is constitutionally vested with authority to establish levels of compensation payable to state employees in a particular fiscal year by virtue of the authority to establish classifications and grades is similar to an argument presented to this court in the context of the predecessor to article XII, section 13(8), in *Vivian v. Bloom,* 115 Colo. 579, 177 P.2d 541 (1947).[8] We rejected the ar-

---

8. The prior version of article XII, section 13(8), stated in pertinent part as follows:

Persons in the classified service shall hold their respective positions during efficient service and shall be graded and compensated

gument then, and find no basis in the slightly different language of the present constitutional provision to alter that view.

In *Vivian*, we distinguished the constitutional authority of the Civil Service Commission to classify employment positions and recommend salary increases from the authority of the General Assembly to appropriate funds for and thereby ultimately establish levels of compensation for state employees. *Vivian*, 115 Colo. at 586, 177 P.2d at 543–44. We enumerated the powers of the Commission, concluded that no express or implied provision of the constitutional amendment granted unilateral authority to the Commission to establish the salary levels of state employees, and determined that the only reference to compensation contained in the amendment was a requirement that persons should hold their positions "during efficient service and shall be graded and compensated according to standards of efficient service." 115 Colo. at 585, 177 P.2d at 543–44. We then concluded that the amendment did not deprive the General Assembly of ultimate authority to fix levels of compensation for the classifications and grades established by the Commission. *Id.*

The employees in essence assert that article XII, sections 13 and 14, establish an executive agency with exclusive authority to establish compensation levels payable to positions, classes and grades as well as exclusive authority to establish positions, classes and grades on the basis of merit. An identical assertion was expressly rejected by this court in *Vivian*. In that case, plaintiff state employees filed a declaratory judgment action seeking judicial answers to the following four questions:

(a) Whether or not the Governor, the General Assembly or either of them has any right, power or duty to fix, approve, or disapprove salaries for persons within the classified civil service?

(b) Whether the General Assembly has authority to classify state employees within the classified civil service and to discriminate with regard to their salaries so that persons performing the same or similar duties are unequally paid?

(c) Whether or not the State Treasurer shall pay the salaries within the classified civil service as fixed by the Civil Service Commission, or as determined by the Governor, or by the General Assembly?

(d) Whether salaries, by whomsoever fixed, which compensate like service unequally, are valid?

*Vivian v. Bloom*, 115 Colo. at 581, 177 P.2d at 542. In reversing the trial court's judgment in favor of the plaintiffs, we answered those four questions as follows:

(a) That the Assembly has the power and duty to fix the salaries for classes and grades set up by the Commission subject to right of veto by the Governor as in case of other legislation; that it has no power to fix the salaries of individuals other than by class and grade; that in any case where the legislature has delegated such authority to the Governor, the authority of the latter is equally limited to the fixing, approval or disapproval of salaries only by class and grade.

(b) That the Assembly has no authority to discriminate in regard to salaries between members of any class and grade as established by the Commission.

(c) That the state treasurer is required to pay salaries as fixed by legislative enactment or by any agency duly authorized by such enactment as to class and grade as set up by the Commission upon certification by the Commission of appointment pursuant to law as required by the amendment.

(d) That salaries must be fixed according to class and grade as established by the Commission and the determination of equality of service rests in its discretion.

*Vivian v. Bloom*, 115 Colo. at 588, 177 P.2d at 545. In so doing, we rejected the argument that under our constitutional scheme the Commission's power to classify included the power to compensate. 115 Colo. at

---

according to standards of efficient service which shall be the same for all persons having like duties.

*Vivian v. Bloom*, 115 Colo. 579, 585, 177 P.2d 541, 543 (1947).

585, 177 P.2d at 544. We pointed out that although civil service systems in other jurisdictions were characterized by an executive agency combining the power of compensation with the power of classification, the electorate of this state rejected such model in favor of a system that separated the legislative power of appropriation from the executive power of classification. 115 Colo. at 585, 586, 177 P.2d at 544. This fundamental distinction was not altered by the 1970 initiative.

We also recognized that the Commission was granted exclusive constitutional authority to establish positions, classes and grades, which recognition led to our observation that the constitutional provisions establishing the Commission were not an empty shell, but did in fact restrict the General Assembly's authority of appropriation by prohibiting the exercise of such authority "to fix the salary of an individual employee." 115 Colo. at 587, 177 P.2d at 545. We concluded, however, that the General Assembly retained the authority to "fix the salary of each class and grade as established by the Commission, and the performance of its obligations so to fix salaries is necessary for the proper establishment of civil service in Colorado in accordance with that amendment." *Id.*, 177 P.2d at 545. The distinction was drawn between the authority to fix compensation levels of individuals, the exercise of which would necessarily undermine the Commis-

sion's obligation to employ persons according to merit-based criteria, and the authority to fix compensation levels for particular classifications and grades, the exercise of which would not necessarily undermine the Commission's responsibility to establish and implement merit-based personnel criteria.[9]

The current constitutional provisions establishing the authority of the Department and the director do not differ materially from the former constitutional provisions establishing the Commission. Article XII, section 13(8), provides, as did its predecessor, that a person shall be graded and compensated according to standards of efficient service which shall be the same for all persons having like duties. The provisions of article XII, section 14, defining the administrative authority of the director and describing the rule-making authority of the Board do not differ substantially from the provisions of the prior amendment defining the powers of the Commission.[10] Neither the prior nor the current constitutional amendments contain express limitations on the authority of the General Assembly to appropriate funds for the purpose of compensating state employees other than the prohibition recognized by this court in *Vivian.*

The conclusion that the provisions of article XII, sections 13 and 14, do not require the General Assembly to adopt the levels of compensation for classifications and

9. It may be that in some circumstances legislative decisions establishing compensation levels for particular positions, classifications or grades can be shown to in effect undermine the director's authority to establish meaningful merit-based distinctions between those positions, classifications or grades. The employees argue here that the General Assembly's authority is limited in all circumstances to the authority to appropriate a total amount for compensation of state employees.

10. Article XII, section 14, states in pertinent part as follows:

(3) The state personnel board shall adopt, and may from time to time amend or repeal, rules to implement the provisions of this section and sections 13 and 15 of this article, as amended, and laws enacted pursuant thereto, including but not limited to rules concerning standardization of positions, determination of grades of positions, standards of efficient and

competent service, the conduct of competitive examinations of competence, grievance procedures, appeals from actions by appointing authorities, and conduct of hearings by hearing officers where authorized by law.

Colo. Const. art. XII, § 14(3). The 1918 initiative sets forth the powers of the Civil Service Commission as follows:

The making and enforcement of rules to carry out the purposes of this amendment and of the laws enacted in pursuance hereof, the alteration and rescission of such rules, the conduct of all competitive tests, the determination of all removal or disciplinary cases, the standardization of all positions, the determination of standards of efficient service and the determination of the grades of all positions in the classified service shall be vested in the Commission.

Ch. 102, 1919 Colo. Sess. Laws 341, 342–43.

grades recommended by the director is supported by the conduct of the General Assembly subsequent to the adoption of our constitutional amendments. As previously noted, the General Assembly fixed the salaries of state employees by specific legislation from 1919 until 1972, under both constitutional schemes. Since 1972, all legislation authorizing the director to classify positions and to develop pay plans has expressly excepted from such authority the ability to establish maximum levels of compensation. While not conclusive, the fact that the General Assembly has consistently exercised legislative authority to establish maximum levels of compensation for pay grades suggests that the 1970 amendment, initiated by the legislative department itself, was not designed to transfer to the director the authority to establish such compensation levels. *Cf. People v. Davis*, 794 P.2d 159 (Colo.1990); *Rauschenberger v. Radetsky*, 745 P.2d 640 (Colo.1987); *People v. Green*, 734 P.2d 616 (Colo.1987).

### B

The employees alternatively suggest that the statutory scheme adopted by the General Assembly authorizes the director to establish specific levels of compensation to be paid to state employees. They suggest that as a result of this statutory scheme the General Assembly may either appropriate a sum sufficient to implement the pay plan developed by the director or appropriate a sum less than that amount, but may not rely upon section 24–50–104(6), 10B C.R.S. (1988), to establish specific monthly salary levels for specific salary grades. We disagree.

It must first be observed that any effort by the General Assembly to transfer the legislative authority of appropriation to an officer in the executive department of government might raise serious constitutional separation of powers questions. *See* Colo. Const. art. III; *Colorado General Assembly v. Lamm*, 704 P.2d 1371 (Colo. 1985); *Anderson v. Lamm*, 195 Colo. 437, 579 P.2d 620 (1978). In our view, the current statutory scheme accomplishes no

such transfer of the authority of appropriation.

In construing a comprehensive legislative scheme promulgated by the General Assembly, we must consider all of the provisions together, in harmony, to give effect to the overall legislative intent. *City of Florence v. Board of Waterworks*, 793 P.2d 148 (Colo.1990); *Martinez v. Continental Enters.*, 730 P.2d 308 (Colo.1986). Our review of the pertinent statutory provisions must be guided by this principle.

Section 24–50–101 articulates the general purposes of the state personnel system and the duties of the director, as follows:

> It is the purpose of the state personnel system, as a merit system, to assure that a well-qualified work force is serving the residents of Colorado, that all segments of its population have an equal opportunity for entry into state employment, that recruitment be from qualified individuals from appropriate sources, and that, after fair and open competition, selection be on the basis of job-related ability and quality of performance....

§ 24–50–101(3)(a), 10B C.R.S. (1988).

> It is the duty of the state personnel director to establish the general criteria for adherence to the merit principles and for fair treatment of individuals within the state personnel system....

§ 24–50–101(3)(c), 10B C.R.S. (1988).

> It is also the policy of the state to base employee advancement and compensation on demonstrated ability and quality of performance in order to encourage and achieve high levels of performance and productivity by state employees.

§ 24–50–101(4), 10B C.R.S. (1988). These provisions emphasize the constitutionally based policy of ensuring that employment within the state personnel system will be based on job-related abilities and quality of performance. The language neither states nor implies that the director's responsibility to establish "general" criteria to ensure adherence to merit principles includes authority to ignore other specific statutory provisions addressing issues of compensation.

Section 24–50–102 requires the director to transmit an annual report to the Governor and to the General Assembly accounting for the director's discharge of the responsibilities "assigned by law or directive to the [Department]," § 24–50–102(3), 10B C.R.S. (1988), and to transmit to the General Assembly recommendations concerning compensation of state employees serving in the military concurrently with their status as state employees and concerning the feasibility of providing state employees with long-term disability insurance. § 24–50–102(5), 10B C.R.S. (1988). The provision requiring an accounting for the exercise of responsibilities assigned "by law" to the director reflects the fact that the director's authority is defined and thus limited by several statutes. The provision requiring transmittal of recommendations with regard to special compensation programs recognizes the General Assembly's ultimate authority to determine the amount of state funds to be appropriated for state programs, including programs for compensation of state employees. *Anderson v. State Dep't of Personnel*, 756 P.2d 969 (Colo.1988). *See Vivian v. Bloom*, 115 Colo. 579, 177 P.2d 541 (1947).

Section 24–50–104 contains provisions respecting classification and compensation of state employees. The director is required to establish pay plans "based on demonstrated ability and quality of performance," § 24–50–104(2)(b), 10B C.R.S. (1988), and to prepare, maintain and revise classification systems for all non-exempt positions in state government. § 24–50–104(3)(a), 10B C.R.S. (1988). However, the authority of the director to develop pay plans is circumscribed by subsections 24–50–104(3)(b), (c), (d), (e) and (f), which set forth specific criteria which must be utilized by the director in creating such plans.[11] These provisions support the view that the authority of the director to design pay plans is limited by policy determinations established by the General Assembly in various sections of the entire statutory scheme.

Sections 24–50–104(4) and –104(5) describe the director's responsibilities for revising and maintaining the classification system and for conducting salary and fringe benefit surveys. When revising the classification system, the director must "assign the class to an appropriate pay grade, salary rate, or salary range." § 24–50–104(4)(b), 10B C.R.S. (1988). Section 24–50–104(4)(d)(II) contains the following pertinent provisions respecting the fiscal impact of revisions of the classification system:

> Any assignments or reassignments of classes to pay grades, salary ranges, or classification relationships required by the creation of new positions or any duly authorized reorganization of change in work method which have a fiscal impact shall be made effective, with the approval of the governor, on the ensuing July 1.... In order for the fiscal impact of any such classification study to be included in the annual general appropriation bill, the results of such study shall be submitted to the general assembly no later than February 15 of each year. Each study shall contain a detailed fiscal

---

**11.** Subsection (3)(b) provides that the classification system must be based on "sound, systematic occupational analysis and position evaluation methods which provide for consistent occupational groupings of classes and uniform alignment of classes and salaries...." § 24–50–104(3)(b), 10B C.R.S. (1988). Subsection (3)(c) provides that all "[p]ositions having comparable duties and responsibilities shall be grouped into classes subject to the same descriptive title, a definition of duties and responsibilities, and requirements for filling positions in the class." § 24–50–104(3)(c), 10B C.R.S. (1988). According to subsection (3)(d), the "[c]lasses of positions shall be grouped and related to occupational levels of work which can be clearly distinguished and logically related to a compensa- tion system." § 24–50–104(3)(d), 10B C.R.S. (1988). Subsection (3)(e) provides that the pay grade, salary rate, or salary range established for each occupational level of classes shall consider the levels of difficulty and the differences. in duties and responsibilities of each class as well as levels of compensation of comparable employments in other places of public and private employment in appropriate competitive labor markets. § 24–50–104(3)(e), 10B C.R.S. (1988). Subsection (3)(f) requires the state personnel director to "allocate individual positions to classes based on a clear evaluation of duties and responsibilities assigned by the appointing authorities." § 24–50–104(3)(f), 10B C.R.S. (1988).

impact calculation by agency and department. Other than as provided in section 24–50–109.5 or in paragraph (g) of subsection (5) of this section, the only exception to the July 1 date regarding any assignment or reassignment of classes to pay grades, salary rates, or salary ranges, including those resulting from special salary surveys, shall be made in ... urgent situations.... In such urgent situations, upon approval of the governor and the state personnel director, such changes shall be effective on the first day of the month following such approval.

§ 24–50–104(4)(d)(II), 10B C.R.S. (1988).[12]

Criteria for the director's conduct of salary and fringe benefit surveys are established by section 24–50–104(5). The director is required to recommend to the Governor "salary adjustments by pay plans developed in accordance with [§ 24–50–104(6) ]," § 24–50–104(5)(d), 10B C.R.S. (1988), and the salary survey data "shall be presented on the basis of recommended grades for all classes effective on the ensuing July 1." § 24–50–104(5)(f), 10B C.R.S. (1988). Finally, the director is required to report compensation recommendations to the Governor in time for ultimate consideration by the General Assembly. § 24–50–104(5)(g)(I), 10B C.R.S. (1988).

When construed together, subsections 24–50–104(4) and (5) establish a comprehensive scheme authorizing the director to develop pay plans establishing classes, positions and grades of pay based upon salary and benefit surveys; to revise such pay plans under specific criteria; and to submit the results of the exercise of such authority in the form of recommendations to the Governor and, ultimately, the General Assembly. The director's authority to develop pay plans, as established by section 24–50–104(6), is expressly limited with respect to the establishment of maximum monthly salary levels. When construed as a whole, this statutory scheme clearly prohibits the director from developing pay plans containing monthly salary levels in excess of the levels established by the General Assembly.

Sound policy considerations support this construction of the statutory scheme. Although the constitutional provisions and their attendant legislation are designed in part to encourage career service for and to benefit employees, see § 24–50–104(2), 10B C.R.S. (1988), the primary objective of the system is promotion of the best interests of the public as a whole. *Turner v. Denver*, 146 Colo. 336, 361 P.2d 631 (1961). Promotion of confidence in the state personnel system as a whole requires the General Assembly to ensure fiscal integrity in the overall compensation scheme. By maintaining a salary cap in pay plans, the General Assembly fosters public confidence in the fiscal integrity of the entire personnel system.

■ Furthermore, it is well settled that our constitution grants the General Assembly primary responsibility for determining the amount of revenue to be expended in carrying out the public policies of the state. Colo. Const. art. V, § 1; *Colorado General Assembly v. Lamm*, 700 P.2d 508 (Colo. 1985); *Anderson v. Lamm*, 195 Colo. 437, 579 P.2d 620 (1978); *Vivian v. Bloom*, 115 Colo. 579, 177 P.2d 541 (1947). The responsible exercise of this power of the purse requires the legislative branch to assume ultimate accountability for the appropriation process. *Vivian*, 115 Colo. 579, 177 P.2d 541. The personnel budget of the state constitutes a significant category of each annual budget. To construe the statutory scheme establishing the state personnel system as authorizing an appointed executive officer to control the appropriations process as it is impacted by classification and reclassification decisions would represent a major alteration of the system of checks and balances prevailing in the arena of governmental fiscal responsibility. *See* H. Eliot Kaplan, *The Law of Civil Service*, at 122–23 (1958).

---

**12.** Section 24–50–109.5, 10B C.R.S. (1988), defines conditions which are to be deemed urgent

fiscal situations.

The employees suggest that to the extent the statutory scheme does not authorize the director to establish unilaterally the amount to be appropriated annually for compensation of state employees, that scheme does authorize the director to establish all specific levels of compensation. Thus, according to the employees, the General Assembly, in response to the salary recommendations contained in a pay plan developed by the director, may either appropriate a sum sufficient to accomplish those recommendations, or appropriate some lesser overall sum, but may not alter the specific salary recommendations contained in such pay plan. These arguments ignore the express language limiting the contents of pay plans contained in section 24–50–104(6), 10B C.R.S. (1988). They also overlook the consistent practice of the General Assembly since 1919 of establishing discrete salary levels by specific legislation. While the General Assembly is required to appropriate funds adequate to carry out the purposes of article XII, sections 13, 14 and 15, those purposes include the requirement that the director adhere to relevant legislative criteria in exercising the authority of that office. Those criteria include the salary level limitations contained in section 24–50–104(6).

## IV

The employees assert that section 24–50–104(6) violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.[13] They assert that the provisions of section 24–50–104(6) establishing maximum monthly salary levels bear no reasonable relationship to any legitimate governmental purpose and thus unfairly discriminate between state employees classified at grade 99 and all other state employees. We disagree.

13. The employees have cited cases considering issues of property rights and procedural due process rights under the Fourteenth Amendment. The employees did not assert procedural due process rights at trial; therefore, those issues will not be considered on appeal. *Ortho Pharmaceutical Corp. v. Heath*, 722 P.2d 410, 415 n. 3 (Colo.1986); *Colgan v. Department of Revenue, Motor Vehicle Div.*, 623 P.2d 871 (Colo. 1981).

The standards applicable to equal protection clause challenges to legislative classifications are well established. In the absence of an infringement of a fundamental right or the creation of a suspect class, legislative classifications do not contravene equal protection standards if the statutory scheme has a reasonable basis in fact and bears a rational relationship to a legitimate governmental interest. *Persichini v. Brad Ragan, Inc.*, 735 P.2d 168, 174 (Colo.1987); *Lee v. Colorado Dep't of Health*, 718 P.2d 221, 227 (Colo.1986). A party challenging a statutory classification bears the burden of proving beyond a reasonable doubt that the classification is unreasonable or, if reasonable, is unrelated to any legitimate governmental purpose. *Lee*, 718 P.2d at 227.

In view of its decision in 1973 to authorize the director to develop merit-based pay plans that include salary rates and ranges, retention by the General Assembly of ultimate fiscal control over the personnel budget of the state by establishing some limitations on the contents of pay plans recommended by the director represents a reasonable exercise of legislative responsibility for maintaining the fiscal integrity of the state personnel system. *See Vivian v. Bloom*, 115 Colo. 579, 586, 177 P.2d 541, 544 (1947). The determination to establish the maximum monthly salary that may be earned by state employees bears a reasonable relationship to that governmental interest. Furthermore, the maximum monthly salary level limitation contained in section 24–50–104(6) does not discriminate between members of a given class or grade. The statute furthers a legitimate governmental purpose, and the distinctions contained therein are reasonably related to that purpose.[14]

14. In their reply brief the employees suggest that § 24–50–104(6) violates the doctrine of the separation of powers established by article III of the Colorado Constitution. *See Colorado General Assembly v. Lamm*, 704 P.2d 1371 (Colo. 1985); *Pena v. District Court*, 681 P.2d 953 (Colo.1984); *Denver and Rio Grande Western R.R. Co. v. City & County of Denver*, 673 P.2d 354 (Colo.1983). This issue was not previously raised; we therefore decline to address it. *Or-*

## V

For the foregoing reasons, the judgment of the trial court is affirmed.

MULLARKEY, J., dissents and QUINN, J., joins the dissent.

VOLLACK, J., does not participate.

Justice MULLARKEY, dissenting:

The majority holds that nothing in our state constitution prohibits the general assembly from paying the same salary to state employees who perform unlike or dissimilar services or from setting a maximum salary cap without regard to the standards and grades of employment which are established by the director of the department of personnel (director) or the state personnel board (board).[1] The effect of these holdings is to make the relevant provisions of Sections 13 and 14 of Article XII of the Constitution superfluous. Because Article XII of the Constitution is intended to provide a system of fair and relative compensation for state employees according to the different standards and grades of employment established by the board, and thus to restrain the power of the general assembly to do otherwise, either directly or by any other device, I respectfully dissent.

The public employees here claim that section 24–50–104(6), 10B C.R.S. (1988), which mandates a maximum salary level for public employees, violates certain sections of Article XII (the civil service amendment). The majority rejects that claim, relying primarily on *Vivian v. Bloom*, 115 Colo. 579, 177 P.2d 541 (1947). Our analysis in that case, however, does not support the majority's conclusion that Article XII, Section 13(8) "neither expressly nor by necessary implication prohibits payment of identical compensation to state employees performing unlike or dissimilar services." Maj. op.

at 51. In my view, the issues presented by the employees require a more exacting review of our precedents construing the civil service amendment and the history of that amendment. Specifically, this case requires us to make a clearer determination of the constitutional division of power between the general assembly and the constitutionally created personnel board, a determination which upholds the purpose and use of each clause and sentence of the civil service amendment. *See Colorado State Civil Serv. Employees Ass'n v. Love*, 167 Colo. 436, 448 P.2d 624, 630 (1968).

In *Colorado Ass'n of Public Employees v. Lamm*, 677 P.2d 1350 (Colo.1984), we held that "[t]he provisions of Article XII of the Colorado Constitution set forth in detail the principles under which the state personnel system is to operate. While the General Assembly can supplement the provisions of Article XII, no legislation contrary to the express or implicit requirements of that Article can survive a constitutional challenge." 677 P.2d at 1353. We also noted that "the connection between statute and [board] rule is sometimes a subtle one...." *Lamm*, 677 P.2d at 1361. Subsequently, in *Colorado Ass'n of Pub. Emp. v. Colorado Department of Highways (D.O.H.)*, we held that "[t]he Board, created by section 14 of Article XII, adopted contemporaneously with section 13, has an essential role in elaborating upon the framework established by that latter section." 809 P.2d 988, 993 (Colo.1991) (citing *In re Interrogatories of the Governor*, 111 Colo. 406, 412, 141 P.2d 899, 902 (1943) ("rulemaking is one of the Board's constitutional functions")). However, we also stated there that the general assembly has a "concurrent role in fleshing out the details of the state personnel system." *D.O.H.*, 809 P.2d at 993. *See* Article XII, § 14(3) and (4) (providing that laws may be enacted pursu-

---

*tho Pharmaceutical Corp. v. Heath*, 722 P.2d 410, 415 n. 3 (Colo.1986); *Colgan v. Department of Revenue, Motor Vehicle Div.*, 623 P.2d 871 (Colo.1981); *Matthews v. Tri–County Water*, 200 Colo. 202, 613 P.2d 889 (1980).

**1.** I note that although by statute the director now performs many of the constitutional functions of the board in addition to the day-to-day administration of the personnel system, Article XII, Section 14(4) provides that the director shall administer the system under the constitution and the laws enacted pursuant thereto, and under the rules adopted by the board. Thus, for the purposes of this dissent, I shall refer to the board as the proper constitutional actor vis-a-vis the general assembly.

ant to the civil service amendment). In *D.O.H.*, we concluded that the constitution "contemplates the elaboration of the Civil Service Amendment through laws enacted by the legislature and rules adopted by the Board." 809 P.2d at 993.

There is a tension in *D.O.H.* between our recognition of the "essential role" of the board and our recognition of the "concurrent role" of the general assembly as to implementation of the state personnel system. We were not required to resolve that tension in *D.O.H.* because neither the legislature nor the board had attempted to address "contracting out," the practice there in question. The case now before us, however, requires resolution of this tension as to the constitutional division of power between the general assembly and the board because there is a direct conflict between the legislative act capping salaries and the board's setting of standards and grades. The majority errs because it eliminates the board's constitutionally-created power by subordinating it to the legislative will. Again wrongly construing *Vivian*, maj. op. at 51, 52–53, the majority fails (1) to differentiate adequately between the legislative power to fix salaries and the board's power to determine the grades of positions of public employees and (2) to see clearly the necessary effect which a determination of those grades must have, under the constitution, on the legislative power to set the salaries of public employees.

Certain principles of constitutional construction serve to resolve the latent tension in *D.O.H.*. In *Love* we articulated the following principles which govern the construction of a constitutional provision. As I have already suggested, "[e]ach clause and sentence" of a constitutional amendment "must be presumed to have purpose and use, which neither the courts nor the legislature may ignore." *Love*, 448 P.2d at 630. Secondly, in "interpreting a constitutional amendment, which has been adopted by popular vote, the court must presume that the words were used in their ordinary meaning and that the people intended what they have said." *Id.* at 628. Thirdly, the "governing principle, long adhered to in this state, is that legislative construction

cannot abrogate the plain meaning of the Constitution." *Id.*, at 630. In addition, "[t]here is a presumption that the language and structure of a provision in a constitution were adopted by choice, and that discrimination was exercised in the language and structure used." *White v. Anderson*, 155 Colo. 291, 394 P.2d 333, 336 (1964).

Applying the foregoing principles to our seemingly conflicting holdings in *D.O.H.*, I would conclude that the concurrent power of the general assembly to implement the civil service amendment does not include the power to annul the purpose of that provision which specifically allocates to the board the power to standardize positions and to determine the grades of positions. The purpose of this specific allocation of power to the board is to ensure that state employees "shall be *graded* ... according to standards of efficient service which shall be the same for all persons having like duties." Article XII, § 13(8) (emphasis added). Thus, the grading of public employees is at least equal in constitutional stature to the compensating of those employees. Since grading is an essential element of the merit-based personnel system, it therefore cannot be secondary to, or derivative of, compensation. If anything, compensation is a function of gradation.

The general assembly, which has the power of the purse, is commanded by the civil service amendment to make adequate appropriations to carry out the purposes of the amendment. Article XII, § 14(5). The purpose of the general assembly's concurrent power to implement the amendment is to ensure that state employees "shall be ... *compensated* according to standards of efficient service which shall be the same for all persons having like duties." Article XII, § 13(8) (emphasis added). Thus, the language and structure of the civil service amendment mandate a division of authority which cannot be breached by powers otherwise concurrent. Any other construction would render vital clauses and sentences of the amendment useless or ineffective. *See In re Interrogatories of the U.S. District Court*, 642 P.2d 496, 497 (Colo.1982) (court "guided by a longstanding rule of constitu-

tional construction that provisions in this state's constitution are to be interpreted as a whole with effect given to every term contained therein.").

Thus, I believe that the civil service amendment should be construed to maintain the allocation, between the board and the legislature, of the power to determine the grades of employment and of the power to fix salaries respectively, but simultaneously to recognize that the former must necessarily affect the latter. In my view, this construction of the civil service amendment is the basis of the analysis in *Vivian*, to which I shall turn after presenting a complete review of the history of the civil service amendment.

I begin by noting that the majority's consideration of the "evolution of this state's institutional responses" to the problems of recruitment, retention and compensation of public employees, maj. op. at 47–49, glosses over the history of antagonism between the general assembly and the people of the state as to the proper institutional solution to the civil service question. In contrast, in our recent review of the history of the constitutional amendments establishing the state personnel system in *Colo. Ass'n of Pub. Emp. v. Bd. of Regents*, 804 P.2d 138 (1990), we candidly re-acknowledged the possibility of hostile legislation toward the civil service system in general and toward the compensation of civil service employees in particular. In *Regents*, we "recognized that [the civil service] amendment embodies the strong disposition of the people of Colorado to protect the state civil service system from 'destruction or emasculation ... in the future by some possible hostile general assembly.' " 804 P.2d at 145 (*quoting People ex rel. Clay v. Bradley*, 66 Colo. 186, 179 P. 871 (1919)).

The *Bradley* court took judicial notice of the legislative history of the civil service before the first civil service amendment to the Constitution, initiated and approved by the voters in 1918. It noted that civil service ended up in the constitution because the general assembly thwarted the people's attempt at reform through an initiated act:

In 1907 the Legislature enacted a so-called Civil Service Law (S.L. 1907, c. 117); in 1912 this was amended by initiated law (S.L. 1913, p. 682); in 1915 the Legislature passed a new act and repealed all others (S.L. 1915, p. 143); ...

\* \* \* \* \* \*

Before the act of 1912, Legislatures were occasionally hostile to the merit system, and refused appropriation to support the commission. The act of 1912 was initiated to compel appropriations and to remedy other defects, and did so. By the act of 1915, however, which repealed all former laws, the Legislature, from the standpoint of those especially devoted to the merit system, destroyed much of its beneficial effect, and the constitutional amendment was initiated accordingly for the very purpose of avoiding the destruction or emasculation of the law in the future by some possible hostile General Assembly. These are matters which should be taken into consideration in construing the amendment in question.

*Bradley*, 179 P. at 871 and 872. That the 1912 statute, initiated by the people to compel appropriations and to remedy other defects, was subsequently repealed by the general assembly is only one of the more egregious examples of the legislature's hostility toward the civil service system.

Since 1919, and including after the 1970 amendments, this court has considered the persistent antagonism of the general assembly toward the civil service when addressing disputes over public employment and compensation. *See D.O.H.*, 809 P.2d 988, 991, 995 (observing that the "Civil Service Amendment was originally adopted in 1918 in response to legislative hostility towards a merit-based civil service" and holding that "any reorganization must still comply with the policies and strictures of the Civil Service Amendment") (footnote omitted); *Regents*, 804 P.2d 138, 146 (statute which forced employees of university hospital to leave the personnel system held to violate "Article XII, Section 13, which protects state personnel from legislative measures designed to circumvent the constitutional amendment"); *Lamm*, 677 P.2d

1350, 1359–60 (holding that a promotion by any other name remains a promotion under Article XII, Section 13(1)); *Love,* 167 Colo. 436, 448 P.2d 624 (declaring sections of an administrative reorganization statute unconstitutional for excluding certain department directors from the civil service); *Vivian,* 115 Colo. 579, 177 P.2d 541, 545 (holding that "equal salaries for all persons having like classification are assured" by the civil service amendment); *People ex rel. Kelly v. Milliken,* 74 Colo. 456, 457, 223 P. 40 (1924) (holding that since the tenure of certain offices was secured to the plaintiffs "by the Constitution, the so-called civil service amendment, (article XII, § 13), the legislature has no power to deprive them of it.").

Thus, the 1970 amendments to the civil service amendment did not, and were not intended to, modify or detract from the grant of power to the board to standardize positions and to determine the grades of positions. Although the 1970 amendments replaced the Civil Service Commission with the board, the amendments preserved the language and structure of the 1918 amendment, allocating the same relevant powers to the board that were formerly allocated to the commission. Thus, the power to adopt rules to implement the relevant sections of Article XII, including rules "concerning standardization of positions, determination of grades of positions, [and] standards of efficient and competent service," Article XII, Section 14(3), was allocated to the board just as the identical power was allocated to the commission.[2]

The majority also compares the present Article XII, Section 14(3) with the first civil service amendment, Ch. 102, 1919 Colo. Sess. Laws 341, 342–43, but concludes that "[n]either the prior nor the current consti-

tutional amendments contain express limitations on the authority of the General Assembly to appropriate funds for the purpose of compensating state employees ...," other than the one limitation recognized by the majority's narrow reading of *Vivian.* Maj. op. at 53, n. 10. The majority supposes that this conclusion is further supported by the conduct of the general assembly in having fixed the salaries of state employees "by specific legislation from 1919 until 1972, under both constitutional schemes." Maj. op. at 54. *Contra Love,* 448 P.2d 624, 630 (" 'Contemporary construction can never abrogate the text; it can never fritter away its obvious sense; it can never narrow down its true limitations....' ") (quoting *People ex rel. Seeley v. May,* 9 Colo. 80, 10 P. 641 (1885)).

The issue, however, is not whether the general assembly has the power to fix salaries, but whether the general assembly can fix those salaries without regard to the grades determined by the board. In other words, what are the strictures which the civil service amendment places on the general assembly's power to fix compensation? In my view, the salary cap functions in practice to defeat the range of grades established by the board, rendering the constitutional mandate to standardize and grade positions an exercise in futility.

Because the 1970 amendments did not alter the division of power between the general assembly and the constitutional successor to the commission, namely, the board, our analysis in *Vivian,* 115 Colo. 579, 177 P.2d 541 (1947), remains authoritative and is on point here if properly construed. In *Vivian,* we held that "[u]nder the [predecessor] amendment the Assembly can no longer fix the salary of an

---

**2.** *See also* Legislative Council of the Colorado General Assembly, *An Analysis of the 1970 Ballot Proposals,* Research Publication No. 151 (1970) at p. 5: "The present three-member Civil Service Commission would be replaced with a five-member State Personnel Board. The new board would establish rules for the state personnel system ..., such rules to include standardization of positions, determination of grades of positions, [and] standards of efficient and competent service.... Under the proposed new organizational structure, the board itself would

become primarily a *policy-making* and appeals body, less concerned with the day-to-day administration of the personnel system than is the present Civil Service Commission" (emphasis added). "The legislative council's interpretation, while not binding, provides important insight into the electorate's understanding of the amendment when it was passed." *Carrara Place v. Bd. of Equalization,* 761 P.2d 197 (Colo.1988). The majority notes the board's policy-making function, maj. op. at 48, but fails to attach any significance to it.

individual employee, but only of the salary of each class and grade as established, by the Commission, and the performance of its obligation so to fix salaries is necessary for the proper establishment of civil service in Colorado in accordance with the amendment." 177 P.2d 541, 545. The language used there is crucial. We explicitly characterized the general assembly's role as an "obligation," that is, an obligation to fix the salaries of *each* class and grade as established" by the predecessor to the board.

This obligation is given substance only if we construe the amendment to mean that the general assembly is obliged to fix the salaries of each grade after the grades are determined by the board and to fix those salaries so as to correspond to the range of those grades. The majority opinion, in contrast, reduces the amendment's mandates to mere exhortations. In *Vivian*, we delineated the constitutional power of the board's predecessor, holding that:

> There is no express or implied provision [in the civil service amendment] transferring to the Commission authority to fix salaries. The only reference to compensation is contained in the declaration of the third paragraph that, "Persons in the classified service shall hold their respective positions during efficient service and shall be graded and compensated according to standards of efficient service which shall be the same for all persons having like duties." No suggestion is therein contained that either the grading or compensation shall be made by the Commission, *but in the fourth paragraph the authority to standardize and grade is specifically given to the commission.* The specific declaration of the one indicates the exclusion of the other.

177 P.2d at 543–44 (emphasis added). I would hold here that the converse applies as well. Just as the constitutional declaration of the board's authority to standardize and grade excludes the authority to compensate, the same declaration implies that the power to compensate other than according to the grades determined by the board is excluded from the general assembly's otherwise unrestricted power to appropri-

ate funds for compensation. This proposition simply restates the constitutionally-created division of power. Neither the general assembly nor the board can both grade and compensate personnel positions, and the funds for that compensation cannot be appropriated in a way which defeats the standards and grades which are determined by the board.

Thus, just as we could not concur in *Vivian* with the contention that the "power to classify carries with it by necessary implication the power to fix compensation," 177 P.2d at 544, neither can I concur here with the contention that the power to fix compensation carries with it by necessary implication the *de facto* power to classify or grade either directly *or by any other device.* The statutory salary cap is one such device. This view is amply supported by *Vivian:*

> [T]he authority to fix compensation confers no control as to classification. Authority to classify all employment inside the classified service is plainly and specifically vested by the amendment in the Commission.... The Commission is required to standardize. This can only mean to set up standards by means of which classes and grades of employment can be *distinguished* ... [and] standards by which the *fair and relative* compensation *for different classes and grades* can be determined.

177 P.2d at 544 (emphasis added). The effect of a salary cap which is no longer keyed to the board's own highest standard and grade is to blend or merge, not to distinguish, those classes and grades with lower grades. The conclusion that the cap is another device which in practice circumvents the civil service amendment is confirmed by *Vivian:*

> Compensation must be made appurtenant to class and grade as established by the Commission and the full authority of the Commission to classify and grade may not be undermined by fixing salaries separately for the employees of different departments *or by any other device.* The Assembly has authority to limit appropriation ... and if the appropriation

fails, then [the employees] must be dismissed in accordance with seniority rights.... [S]alaries must be fixed according to class and grade as established by the Commission and the determination and *equality* of service rests in its discretion.

177 P.2d at 545 (emphasis added).

Thus, since the determination of equality (or relative value) of service now rests with the board, I would hold that the civil service amendment prohibits the same compensation to public employees providing services which the board has found to be of different value to the public. Furthermore, the compensation fixed by the general assembly must be fair and relative, that is, relative to the grades and standards as determined by the board. This means that nominal differences in salary which purport to satisfy the grades established by the board, but which bear no fair and relative correspondence to the board's hierarchy of grades, will not pass scrutiny. The board has determined that the employees here are providing the public with services which are not equal, but superior, to the services provided by others. Nevertheless, the employees are effectively classed in practice with those others by the salary cap.[3] This is precisely what the merit-based civil service amendment was designed to prevent.

The majority opinion virtually extinguishes the division of powers mandated by the language and structure of the civil service amendment. Because as we have said so often the intent of the amendment is to protect the merit-based personnel system from the hostile actions of the legislature, I dissent.

QUINN, J., joins in this dissent.

---

3. According to the record, the director determined that certain employees should be graded higher than the then current grade of 99 and that such higher grades should receive correspondingly higher compensation.